**The NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., et al., Plaintiffs,**

v.

**Donald J. DEVINE, Director, Office of Personnel Management, Defendant.**

**Civ. A. No. 81–2999.**

United States District Court, District of Columbia.

March 31, 1983.

Jack Greenberg, James M. Nabrit, III, Charles Stephen Ralston (argued), Lowell Johnston, New York City, Elaine Jones, Barry L. Goldstein, Brent Simmons, Washington, D.C., for NAACP Legal Defense and Educational Fund.

Cesar A. Perales, Robert L. Becker (argued), New York City, William L. Robinson, Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiff Puerto Rican Legal Defense and Education Fund, Inc.

Charles F.C. Ruff, U.S. Atty., Royce C. Lamberth, Asst. U.S. Atty., John D. Bates (argued), Asst. U.S. Atty., Washington, D.C., for defendants; Stuart Rick, Atty., Office of Personnel Management, Washington, D.C., of counsel.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This is an action by the NAACP Legal Defense and Educational Fund, Inc. (LDF) and the Puerto Rican Legal Defense and Education Fund, Inc. (PRLDEF) against the Director of the Office of Personnel Management, by which the plaintiffs challenge certain policies or rules of defendant governing the distribution of funds received from charitable contributions of federal employees through the 1981 Combined Federal Campaign (CFC) fund raising drive. Plaintiffs are eligible to participate in the CFC and have received "designated funds" therefrom, *i.e.,* contributions specifically designated by donors to be distributed to the plaintiffs. *See NAACP Legal Defense and Educational Fund, Inc. v. Campbell,* 504 F.Supp. 1365 (D.D.C.1981) (hereinafter *NAACP LDF I*). In the instant action, plaintiffs seek to ensure that they may receive a portion of "undesignated funds" received by the CFC. Essentially, plaintiffs argue that defendant's policy concerning funds is vague and leads to arbitrary decisions in violation of due process requirements and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Plaintiffs also argue that the denial of access to undesignated funds violates their rights under the first amendment to the Constitution. Both sides have moved for summary judgment. For the reasons which follow, defendant's

motion for summary judgment shall be granted and plaintiffs' motion shall be denied.

The CFC was established pursuant to Executive Order No. 10,927, issued on March 18, 1961, by President Kennedy. It is the only means whereby federal employees and military personnel may be solicited for charitable contributions by private voluntary agencies during working hours at their offices and duty stations. Procedures governing the CFC and requirements for eligibility to participate in the campaign are set forth in the Manual on Fund Raising Within in the Federal Service for Voluntary Health and Welfare Agencies (hereinafter, "Manual").

Organizations participate in the CFC on either the national or local level. Eligibility is determined by officials of the Office of Personnel Management, in accordance with standards set forth in the Manual. There are five authorized voluntary groups, which are: (1) United Way Agencies (local united funds or community chests recognized by the United Way of America), (2) National Health Agencies, (3) International Service Agencies, (4) the American Red Cross, and (5) National Service Agencies. Manual, § 4.2. Plaintiffs are two of a number of organizations in the National Service Agencies (NSA) group. The NSA group within the CFC was only recently created and has not been in existence as long as the other groups.

To participate in the CFC, National Health Agencies and NSAs must receive approval not only from the nationwide campaign but from each local CFC in which they desire to solicit contributions. This is because these agencies might not provide "direct and substantial services" to the public of every particular local CFC area. Manual, § 4.2(b, e). By contrast, International Service Agencies need only receive approval at the national level, their fundraising eligibility not being limited to localities where they have local chapters or committees for the reason that their work generally is performed overseas. Manual, § 4.2(c). American Red Cross units are eligible only in those local CFCs where the Red Cross does not raise funds through the United Way; this, of course, is to avoid duplicative efforts in those areas where the Red Cross is part of the local united fund or community chest. Manual, § 4.2(d). Likewise, National Health Agencies are eligible to raise funds separately through the CFC only in localities where they are not members of the local united fund or community chest. Manual, § 4.2(b). For these and other reasons, since each local CFC may have a different composition of beneficiaries, a substantial amount of local decision making is necessary. Accordingly, decision making authority has been delegated to committees called Local Federal Coordinating Groups (LFCGs). *E.g.*, Manual, §§ 4.2A–4.3.

Contributors may designate that their donations be distributed to particular agencies participating in the CFC. If a contributor does not designate a particular agency to benefit from the donation, the amount contributed goes into a pool which is divided among the approved agencies based on a formula set forth in the Manual. Manual, § 4.7. It is the manner in which undesignated funds are distributed that is at issue here.

Arriving at a formula for distribution of undesignated funds has been a problem long plaguing the CFC. The difficulties encountered by defendant have been set forth in the affidavit of the Assistant to the Director, Office of Personnel Management. The question of distributing undesignated funds has been of great importance to the voluntary agencies participating in the CFC because of the financial benefits at stake; the agencies' "conflicting objectives and intents have been very difficult to reconcile." First Affidavit of Joseph S. Patti, Assistant to the Director, Office of Personnel Management, Exhibit A to Defendant's Motion (hereinafter, Patti Affidavit I), ¶ 3. The various agency groups have proposed different formulas for distributing undesignated contributions and although defendant has made efforts to arrive at a compromise formula, none of the formulas used by defendant have satisfied the groups. *Id.*

Previous formulas used by defendant employed as a principal feature an established dollar base for each national voluntary agency group. As such, when designated contributions did not meet that base, undesignated funds were applied to cover the shortfall. The remaining undesignated funds were distributed largely through the discretion of the LFCGs. Under such formulas, no group was guaranteed to receive monies from the undesignated contributions. *Id.* at ¶ 4.

The formula used at times relevant to this action came into use in fall 1980, pursuant to revisions to the Manual promulgated at 45 Fed.Reg. 24958–59 (Apr. 11, 1980). Section 4.7 of the revised Manual provides in part that:

> The following method will be used for distribution receipts for all [local] CFCs which have been in existence for five years, unless the representative [sic] of the participating voluntary groups unanimously agree on another method: the local Federal Coordinating Group will allocate what it believes to be a reasonable portion to the undesignated funds to the National Service Agencies who participate in that CFC. The balance of the undesignated funds will be distributed to the United Way, the National Health Agencies, the International Service Agencies, and, when it is not part of the local United Way, the American Red Cross in the same proportions that their respective shares of undesignated funds from the past five campaigns bear to that CFC's total undesignated receipts from its last five campaigns.

. . . . .

This portion of section 4.7 contemplates that undesignated funds could and should be distributed to the National Service Agencies. It also recognizes the problem of determining how to distribute undesignated funds in general, and reflects the government's policy to use past contributing history for guidance in making such determinations. Because the NSAs lacked a five-year contributing history, there could be no such guidance with respect to distributions to those agencies; evidently the "reasonable portion" direction was provided as a result.

Likewise, local CFCs that had not been in existence for five years obviously could not disperse receipts to the other agency groups on the basis of a five-year contributing history; accordingly, section 4.7 provides that in such circumstances the appropriate LFCG will determine how undesignated funds would be distributed to the various groups using "any system they find reasonable except that undesignated funds may not be allocated among the participating groups on the basis of their respective shares of designated contributions." Distributing undesignated funds on such a basis was rejected because such an approach would be equivalent to presuming that those making undesignated contributions had the same intent or preferences as those designating the beneficiaries of their contributions and could work unfairly to the detriment of those organizations lacking high public visibility. *See* Second Affidavit of Joseph S. Patti, Exhibit E to Defendant's Opposition to Plaintiffs' Motion (hereinafter Patti Affidavit II), ¶ 6.

On December 18, 1980, OPM transmitted further guidance, in the form of questions and answers, to the LFCGs on various issues including the question of the distribution of undesignated funds to NSAs. OPM's response was:

> Widely varying local circumstances effectively preclude such guidance. Some FCGs have decided to allot the NSA group that percentage of total undesignated funds which corresponds to NSA's relative share of total designations. Others have attempted to make an approximate determination of the relative community needs served by the NSAs and have allotted undesignated funds to the NSA Group accordingly. Still other FCGs have allotted undesignated funds to the NSA Group on the basis of the number of agencies in the group and the total number of agencies in that CFC. A FCG may use any process or system it chooses to help it determine what is an appropriate share of the undesignated funds for the NSA Group.

*See* Patti Affidavit I, ¶ 8. OPM issued CFC Memorandum No. 81–3 on June 12, 1981, which provided the following guidance:

Q. Now that the National Service Agencies Group has had a year's participation in the CFC, should it be treated differently in this year's campaign?

A. As stated in the Q & A's accompanying the April 11, 1980, revision to the *Fund-Raising Manual,* each LFCG may determine whether and to what extent representatives of the NSA group should participate in campaign planning, administration, cost-sharing and evaluation. Regarding NSA's share of undesignated funds, the Q & A at the top of page 5 of the guidance sent with our December 18, 1980, memorandum should be helpful. LFCG's have had the full authority to allocate any reasonable share (including none) of undesignated funds to NSA inasmuch as the basis for such an allocation varies from CFC to CFC. It is the eventual intent that the NSA group will share in undesignated funds on the same basis as the other major groups; that is, according to the amount of undesignated funds it receives over a five-year base period. Now that LFCG's have a year's experience with NSA agencies, there is a firmer basis for establishing a percentage of undesignated funds that should go to NSA, thus beginning the establishment of a five-year base. But no undesignated funds need to be distributed to this Group this year.

*See* Patti Affidavit I, ¶ 9. Additional guidance was sought by NSA group representatives who met with the Director of OPM; as a result, defendant issued the following from CFC Memorandum No. 81–5, issued July 7, 1981:

Finally, regarding LFCG decisions on the share of undesignated funds going to the National Service Agencies group, our previous instructions remain in effect. Yet, if there is a contribution history for NSA agencies, however brief, an LFCG should seriously consider beginning the establishment of a historical base by allocating a share of undesignated funds to the NSA group so as to bring the group into

the local formula for distributing undesignated funds.

*See* Patti Affidavit I, ¶ 10.

In practice, most of the local CFCs have elected not to award undesignated funds to the NSA group because of a lack of past contributor history. In the 1982 Atlanta CFC, for example, an agreement was reached between the CFC and the four voluntary groups participating therein by which it was agreed that "National Services [sic] Agencies will receive no undesignated money in the 1982 campaign since this is their first year of participation and there is no [giving] history." Metropolitan Atlanta CFC Fund Raising Agreement, Sept. 17, 1981, at 3, attachment 1 to Affidavit of David Alspach, Chairman of 1982 Atlanta CFC (hereinafter, Alspach Affidavit), Exhibit C to Defendant's Motion. Georgia State Senator Julian Bond executed this agreement as representative of the NSAs. The Atlanta CFC planned to consider in the spring of 1982 whether NSAs should share in undesignated funds in the 1983 campaign. Alspach Affidavit, ¶ 3. Similar decisions not to grant awards of undesignated funds to the NSA groups were reached by the New Orleans and Columbia, South Carolina CFCs in light of the lack of any significant history of contributions to that group. Affidavit of Michael A. Adams, New Orleans Federal Executive Board Director, Exhibit D to Defendant's Motion; Affidavit of R. Stedman Sloan, Member, Columbia, South Carolina CFC Screening Committee, Exhibit E to Defendant's Motion.

Likewise, the Washington, D.C. area campaign, the National Capital Area CFC, elected not to include NSAs in the distribution of undesignated funds for the campaign beginning in the fall 1981. As was the case with the other CFCs, the history of contributions to NSAs in the National Capital CFC was limited in that while 13 organizations, including both plaintiffs, participated in the fall 1981 campaign, only three organizations, none of which were plaintiffs, participated in the fall 1980 campaign as NSAs, and none had ever participated

before. Affidavit of Vincent E. Reed, Chairman, Federal Fund Raising Program Coordinating Committee of the National Capital Area CFC (hereinafter Reed Affidavit), Exhibit G to Defendant's Motion, ¶ 5b.

The decision not to include the NSA group in the distribution of undesignated funds by the National Capital CFC was made by the Federal Fund Raising Program Coordinating Committee (the Committee) after hearing from a representative of the NSA group and considering guidance supplied by OPM. Affidavit of William A. Schaeffler, Director, National Capital Area CFC (hereinafter Schaeffler Affidavit), Exhibit F to Defendant's Motion, ¶ 3. The Committee is comprised of approximately 45 federal employees and labor union representatives, and is assisted by a nine-member Technical Advisory Committee (TAC). The membership of the TAC is designed to achieve a broad cross-section of federal employee organizations and points of view. The TAC involved in the decisions in question included five minority group members, and represented three federal executive departments, one independent executive agency, the United States Postal Service, the General Accounting Office, and two major labor unions. Reed Affidavit, ¶ 2.

In June 1981, the director of the National Capital CFC and the chairman of the Committee discussed the Committee's rationale for not including NSAs in the distribution of undesignated funds from the previous year's campaign, and discussed the guidance provided them by OPM. In their view, that guidance made it clear that NSAs should ultimately be recipients of such funds. They also recognized that the prior campaign did provide some small experience, in terms of federal employees' support for NSAs, on which a rationale could be established for allotting a portion of the undesignated funds for the NSAs. Reed Affidavit, ¶ 3.

Three considerations were cited in the decision to exclude the NSAs from undesignated funds support for the fall 1981 campaign. First, the TAC had expressed a *unanimous* view concerning the potential negative impact on the entire National Capital CFC of including some of the NSAs. While the TAC's view had to be disregarded for purposes of deciding the eligibility of such organizations for participation in the CFC, nonetheless it was felt that the diverse composition of the TAC's membership lent its collective views significant credibility as being reflective of the general views of federal employees. Such impact, the Committee believed, would be mitigated by restricting NSAs to designated contributions. Reed Affidavit, ¶ 4a. Second, a history of contribution data for the NSA group was lacking. *Id.* ¶ 4b. Finally, OPM had indicated that the eligibility criteria for all agencies would be clarified and other significant changes in the CFC might be established before the next year's campaign. As such, it seemed possible to the Committee that the whole process of distributing undesignated funds could be altered before the next year's campaign. Reed Affidavit, ¶ 4c.

Lastly, the Houston CFC concluded that it *would* include the NSA group in the distribution of undesignated funds for the 1981 campaign, the exact percentage allocation to be determined at a later date. *See* Exhibit B to Defendant's Motion (letters reflecting the decision and guidance provided by OPM).

With this background established, it is clear that the question of how to distribute undesignated funds has been a troublesome one, and that defendant has examined a number of alternatives before coming to its decision. It is also evident that this is a question that requires local decision making, inasmuch as community needs and interests and the functions of local charitable organizations differ from region to region. In attempting to determine a means for distributing undesignated funds to NSAs, the local CFCs have kept in mind the expressed intention of defendant that NSAs ultimately be allowed a fair share of those funds. The local CFCs, with the guidance given them by defendant, in looking for the best distribution formula, have endeavored

to make certain that such a formula reflects the intentions of the contributors, despite the fact that the intent of a donor is by definition extremely difficult to discern from the making of an undesignated contribution. The arguments advanced by plaintiffs are now considered.

### I. *Vagueness*

Plaintiffs argue that defendant's policy concerning undesignated funds is vague and leads to arbitrary decisions in violation of due process requirements. At the outset, there is some question as to whether plaintiffs have standing to raise a due process challenge. In *The National Health Agencies' Committee for the CFC v. Campbell,* Civil Action No. 78–2313 (D.D.C. Jan. 22, 1982) (Memorandum), slip op. at 5, Judge Penn noted that "The fact that [a] plaintiff anticipates receiving [undesignated CFC] funds does not rise to a legitimate expectation in those funds." Accordingly, no property interest of plaintiff is implicated by the distribution procedure for undesignated funds. In order to address the issues raised by the plaintiff in *National Health Agencies,* Judge Penn proceeded by assuming that the plaintiff had standing to raise those issues on behalf of the contributors to the CFC. *Id.,* slip op. at 4.

■ Assuming that plaintiffs have such standing, the question is whether the Manual and other guidelines governing the authority delegated to local CFCs to distribute undesignated funds provide standards sufficient to prevent arbitrary and discriminatory enforcement. The power to determine the means by which undesignated CFC receipts are to be distributed was delegated by the President, pursuant to Executive Order 10,927, through OPM, and, in accordance with the Manual, to the various LFCGs. A delegation of authority is permissible if the delegation contains an "intelligible principle" by which the agency shall conform. *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928), quoted in *Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 746 (D.D.C.1971) (three-judge court). The standards governing the performance of the task delegated to the agency must provide a "sufficient demarcation of the field [in which the agency is to act] to permit a judgment of whether the agency has kept within the legislative will." *Amalgamated Meat Cutters,* 337 F.Supp. at 746.

■ However, because the purpose of delegation is to facilitate the delegator's task, by definition the administrative agency must have sufficient decision-making discretion within the established limits and standards—otherwise the agency's actions will need always be repeated by the delegator. The agency must be given "broad flexibility to cope within the conditions it encounters." *Id.*

As noted above, with numerous local CFCs involving perhaps hundreds of agencies to administer, local governance is essential. The problem is that of discerning a method of distributing undesignated contributions in a manner that is consistent with the purposes of Executive Order 10,927, *i.e.,* that federal employees are able to make contributions to voluntary, benevolent organizations. This goal has two interrelated objectives: to distribute funds in accordance with the intents of the donors, and to distribute funds with the benefit of the local community in mind. These objectives are connected in that an employee might well be inspired to make undesignated contributions to the CFC on the basis of what accomplishments he is aware that participating agencies have made previously in his community. Likewise, absent any direct indication of intent, it reasonably could be presumed that a contributor not specifying the beneficiary of his donation might prefer that the funds go to an organization that will use them in his community rather than elsewhere.

■ The guidelines issued by OPM, in directing the LFCGs to consider past contribution histories, serve to ensure that the decisions as to how distributions of undesignated funds are made are done in accordance with these considerations. Nonetheless, as the court suggested in *National*

*Health Agencies,* "it is more logical and rational to assume that a donor who does not designate an agency is exercising 'no preference' in the eventual distribution, than to assume he is exercising a preference that his contribution be distributed in the manner [suggested by the plaintiff]." Slip op. at 4. In any case, there is no dispute that the NSA groups have been allowed to participate in the process by which the LFCGs determine how to distribute funds. Accordingly, what the plaintiffs decry as "vagueness" is in reality the flexibility that the CFC and the LFCGs require if the campaign is to be administered fairly in each locality. There is no violation of due process here.

## II. *Plaintiffs' First Amendment Rights*

Plaintiffs make three arguments to support their contention that the decisions denying them undesignated funds violate their rights under the first amendment to the Constitution: (1) that the "unbridled discretion" afforded local CFCs has been used to interfere with plaintiffs' first amendment rights, that the various restrictions on solicitation of contributions hinder such rights, and (3) that the denial of undesignated funds impedes the plaintiffs' ability to carry out programs and activities involving speech and association.

With respect to the first argument, as concluded above the discretion conferred upon LFCGs is not "unbridled," but can only be exercised within certain limits, albeit limits designed to allow flexibility. However, some concern is raised by the fact that at least one LFCG, that governing the National Capital Area CFC (the largest in the country), cited as one reason for denying undesignated funds to NSAs its fear that their presence among the groups in the CFC receiving undesignated funds would have a negative effect upon contributions received. The National Capital CFC's theory evidently was that if NSAs were to share in the undesignated receipts, some potential contributors would be dissuaded from making undesignated gifts to the CFC because those contributors would not want their donations going to groups who engage in activities involving political issues with which they might disagree. Plaintiffs argue that as a result they, as all NSA organizations, have been excluded from receiving undesignated funds because of first amendment-protected activities in which they engage, and that such exclusion therefore offends the first amendment.

This argument was persuasive when the question of the NSAs' eligibility to receive designated contributions through the CFC was at issue in *NAACP LDF I.* However, the instant matter is quite a different case. The rights of those who wish to contribute to plaintiffs through the CFC are not hindered, and indeed have been guaranteed as a result of Judge Gesell's decision. Likewise is the opportunity for plaintiffs to receive designated contributions guaranteed by that decision. By contrast, a donor making undesignated contributions elects to express no preference that his money should be distributed in part to plaintiffs; rather, all he is saying is that his money should go to the public good.

 At the minimum, there must be a rational basis for the LFCG's conclusion that including NSAs among those receiving undesignated funds could inhibit general contributing and a relationship between the decision not to include the NSAs and a legitimate governmental interest. The legitimate interest is clear: the desire to insure that as much funds as possible are received through the CFC. Moreover, to the extent that a person will be inhibited from making undesignated donations when the beneficiaries may include organizations with whose purpose he disagrees, the LFCG's decision is rationally related to that interest. Finally, there is a rational basis for concluding that the presence of NSAs among those receiving undesignated funds might render some employees less apt to make undesignated contributions. Because NSAs such as plaintiffs engage in litigation to advance their objectives, by definition there will be some individuals whose sympathies lie with those seated at the table across the courtroom. Indeed, by denying

undesignated funds to NSAs the local CFCs serve to protect the first amendment interests of those contributors who do not wish that their funds go to support the NSAs' first amendment activities. The decision not to speak or associate is entitled to as much protection under the first amendment as the decision to speak or associate. *See, e.g., Kolinske v. International Union,* 530 F.Supp. 728, 733 (D.D.C.1982); *Gavett v. Alexander,* 477 F.Supp. 1035, 1045 (D.D.C. 1979). Likewise, the right to contribute to political and other causes necessarily includes the right not to contribute. *Kolinske,* 530 F.Supp. at 734, citing *Abood v. Detroit Board of Education,* 431 U.S. 209, 234, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977).

It should also be noted that the decision not to allow the award of undesignated funds to NSAs is not inconsistent with OPM's stated intention to bring those agencies eventually into the distribution of such funds. After a history of designated contributions to NSAs is established, uncertainty as to the intentions and desires of employees within a local CFC will be sharply reduced. This will make it easier to determine the extent to which local contributors are likely to favor the distribution of funds to NSAs, and in what amount distributions should be made. The value and importance of the services performed by the NSAs notwithstanding, at the core, the way monies are to be allotted must be in accordance with the intentions of the donors.

Plaintiffs' second argument focuses on the limitations imposed upon organizations participating in the CFC, which restrict their ability to encourage employees to designate any particular organization to receive their contributions. While admitting that "on their face these requirements fall equally on all agencies admitted to the CFC," *see* Plaintiffs' Memorandum, at 25, plaintiffs argue that the requirements fall unequally on NSA members in those CFCs where they have not received undesignated funds. Stated another way, plaintiffs' argument is that where NSAs do not receive undesignated funds but other agency groups do, NSAs should be excused from the limitations on solicitation so that they might be able to encourage more designated contributions to make up for the undesignated funds unavailable to them.

■ Inasmuch as an important purpose of the Executive Order establishing the CFC was to regulate the solicitation of government employees at their work stations to make contributions to charitable organizations, some restrictions on solicitation are essential. *See* Exec.Order No. 10,-927, § 2, *Manual* § 1.1. Nevertheless, sufficient information must be given to potential contributors as to the choices available regarding the beneficiaries they may designate or the manner in which undesignated funds are distributed. *National Health Agencies,* slip op. at 5. The Manual provides that campaign and publicity materials, developed in the local area, will be issued to employees so that they may make informed choices in their participation in the CFC. Manual § 4.12. To lift the restrictions on the NSAs—restrictions which plaintiffs concede are imposed equally upon all agency groups—but retain them with respect to the other groups would not only be unfair to the other groups but defeat the legitimate regulatory purposes of the Executive Order. Furthermore, there could be no justification for this relief sought by plaintiffs since, as explained above, plaintiffs have no right to undesignated funds and there is no infirmity with the LFCGs' decisions not to grant awards of such funds to the NSA groups.

■ Plaintiffs' third and final first amendment argument similarly is without merit. The fact that plaintiffs would use the funds they would receive for first amendment activities is of no moment to this case. To argue that they are entitled to funds donated by persons who have articulated no preference as to the way in which the funds should be distributed because plaintiffs would use the funds for first amendment activities would essentially be to put the plaintiffs' speech into the silent donors' mouths. This violates the freedom of those donors not to speak, which is protected by the first amendment no less than

the freedom to speak. *Abood,* 431 U.S. at 234, 97 S.Ct. at 1799; *Kolinske,* 530 F.Supp. at 734.

### III. *Equal Protection*

Plaintiffs' argument on this issue in its totality is that "Defendant is unable to demonstrate any compelling reason for a policy which requires the establishment of a five-year historical base before plaintiffs may share in undesignated contributions or on an equal basis with other participating charities." Plaintiffs' Memorandum at 18. This argument is unpersuasive for two reasons. First, plaintiffs misstate defendant's policy, in that defendant has declared that local CFCs should consider distributing undesignated funds to NSAs as soon as some contributor history is established. Second, equal protection analysis is inapplicable because the various groups are *not* similarly situated for the reason that the NSAs only recently have entered the CFC. Accordingly, there is no equal protection violation here.

### IV. *The "Arbitrary, Capricious, and Abuse of Discretion" Argument*

Plaintiffs make two arguments here: that defendant's governing authority—the Manual—does not permit OPM to authorize LFCGs that have been in existence more than five years to deny an allocation of any undesignated funds to NSAs and that defendant has no standards defining "reasonable" for purposes of allocating a "reasonable share" of undesignated funds to NSAs. Both of these arguments have a common basis: that where the Manual directs that a "reasonable" portion of undesignated funds be distributed to NSAs, *some* funds must be allocated. Plaintiffs argue that since "[r]easonable is defined by Webster's as, among other things, not extreme," since "none" is "one extreme," that amount is "by definition, not reasonable." Plaintiffs' Memorandum at 31. The definition from which plaintiffs evidently took their interpretation of the word, when read in full, states that reasonable means "not extreme; sensible; sane." *E.g.* Webster's New World Dictionary, College Ed. (1968), at 1211; *see also* Webster's Third International Dictionary (1968), at 1892 ("not absurd," "not ridiculous," "being or remaining within the bounds of reason," "not extreme," "possessing good sound judgment," "well balanced," "sensible"). Despite what plaintiffs assert, the only sensible distribution of funds may well be no distribution if there is insufficient information upon which to base a determination. Indeed, to distribute funds without any basis would be arbitrary and capricious, and work to the detriment of the other groups participating in the CFC. Adequate standards exist to govern the distribution of undesignated funds. Defendant's policies and decisions at issue here do not violate the provisions of the Administrative Procedure Act cited by plaintiffs and are neither arbitrary nor capricious actions.

In accordance with the foregoing, it is, by the Court, this 31st day of March, 1983,

ORDERED, that plaintiffs' motion for summary judgment shall be and hereby is denied, and it is

FURTHER ORDERED, that defendant's motion for summary judgment shall be and hereby is granted, and it is

FURTHER ORDERED, that this cause stands dismissed, all other pending motions being dismissed as moot.