# CORNELIUS, ACTING DIRECTOR, OFFICE OF PER-SONNEL MANAGEMENT *v.* NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC., ET AL.

No. 84–312.   Argued February 19, 1985—Decided July 2, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 813. STEVENS, J., filed a dissenting opinion, *post*, p. 833. MARSHALL, J., took no part in the consideration or decision of the case. POWELL, J., took no part in the decision of the case.

*Solicitor General Lee* argued the cause for petitioner. With him on the briefs were *Acting Assistant Attorney*

*General Willard, Deputy Solicitor General Geller, Carolyn F. Corwin, Paul Blankenstein,* and *Joseph A. Morris.*

*Charles Stephen Ralston* argued the cause for respondents. With him on the brief were *Julius LeVonne Chambers, James M. Nabrit III, Stuart J. Land, Leonard H. Becker,* and *Boris Feldman.**

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide whether the Federal Government violates the First Amendment when it excludes legal defense and political advocacy organizations from participation in the Combined Federal Campaign (CFC or Campaign), a charity drive aimed at federal employees. The United States District Court for the District of Columbia held that the respondent organizations could not be excluded from the CFC, and the Court of Appeals affirmed. 234 U. S. App. D. C. 148, 727 F. 2d 1247 (1984). We granted certiorari, 469 U. S. 929 (1984), and we now reverse.

I

The CFC is an annual charitable fundraising drive conducted in the federal workplace during working hours largely through the voluntary efforts of federal employees. At all times relevant to this litigation, participating organizations

---

**Joseph B. Scott* and *Michael J. Kator* filed a brief for the United Black Fund of America et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New York by *Robert Abrams,* Attorney General, *Robert Hermann,* Solicitor General, and *Daniel L. Kurtz, Pamela A. Mann,* and *Jill Laurie Goodman,* Assistant Attorneys General; for the American Civil Liberties Union Foundation by *E. Richard Larson, Burt Neuborne, Joseph M. Hassett,* and *Patricia A. Brannan;* for the American Jewish Committee et al. by *Samuel Rabinove* and *Richard T. Foltin;* and for the National Committee for Responsive Philanthropy, Independent Sector, et al. by *David C. Vladeck, Alan B. Morrison, John Cary Sims,* and *Adam Yarmolinsky.*

*Dara Klassel, Eve W. Paul,* and *Roger K. Evans* filed a brief for the Planned Parenthood Federation of America, Inc., as *amicus curiae.*

confined their fundraising activities to a 30-word statement submitted by them for inclusion in the Campaign literature.[1] Volunteer federal employees distribute to their co-workers literature describing the Campaign and the participants along with pledge cards. 5 CFR §§ 950.521(c) and (e) (1983). Contributions may take the form of either a payroll deduction or a lump-sum payment made to a designated agency or to the general Campaign fund. § 950.523. Undesignated contributions are distributed on the local level by a private umbrella organization to certain participating organizations. § 950.509(c)(5). Designated funds are paid directly to the specified recipient. Through the CFC, the Government employees contribute in excess of $100 million to charitable organizations each year. Brief for Petitioner 3.

The CFC is a relatively recent development. Prior to 1957, charitable solicitation in the federal workplace occurred on an ad hoc basis. Federal managers received requests from dozens of organizations seeking endorsements and the right to solicit contributions from federal employees at their worksites. U. S. Civil Service Commission, Manual on Fund-Raising Within the Federal Service for Voluntary Health and Welfare Agencies § 1.1 (1977) (Manual on Fund-Raising). In facilities where solicitation was permitted, weekly campaigns were commonplace. Executive Orders 12353 and 12404 As They Regulate the Combined Federal Campaign (Part 1), Hearing before the House Committee on

---

[1] Effective September 17, 1984, the Office of Personnel Management (OPM) has revised its regulations in an effort to comply with the decisions below. See 49 Fed. Reg. 32735. The new regulations have changed the eligibility criteria at issue in this case and certain operational features of the Campaign. OPM expressly reserved the right to modify the rules in the event of a supervening direction by a court, Congress, or the President. *Ibid.* OPM's position before this Court is consistent with a desire to reinstate its prior regulations. Given these circumstances, the revision of the regulations at issue does not render this case moot. See *Maher* v. *Roe*, 432 U. S. 464, 468–469, n. 4 (1977).

Government Operations, 98th Cong., 1st Sess., 67–68 (1983). Because no systemwide regulations were in place to provide for orderly procedure, fundraising frequently consisted of passing an empty coffee can from employee to employee. *Id.*, at 68. Eventually, the increasing number of entities seeking access to federal buildings and the multiplicity of appeals disrupted the work environment and confused employees who were unfamiliar with the groups seeking contributions. *Ibid.*

In 1957, President Eisenhower established the forerunner of the Combined Federal Campaign to bring order to the solicitation process and to ensure truly voluntary giving by federal employees. Exec. Order No. 10728, 3 CFR 387 (1954–1958 Comp.). The Order established an advisory committee and set forth general procedures and standards for a uniform fundraising program. It permitted no more than three charitable solicitations annually and established a system requiring prior approval by a committee on fundraising for participation by "voluntary health and welfare" agencies. *Id.*, §§ 1(c) and 3(d). One of the principal goals of the plan was to minimize the disturbance of federal employees while on duty. *Id.*, § 1(d).

Four years after this initial effort, President Kennedy abolished the advisory committee and ordered the Chairman of the Civil Service Commission to oversee fundraising by "national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate" in the solicitation of contributions from all federal employees. Exec. Order No. 10927, 3 CFR 454 (1959–1963 Comp.). From 1963 until 1982, the CFC was implemented by guidelines set forth in the Civil Service Commission's Manual on Fund-Raising. Only tax-exempt, nonprofit charitable organizations that were supported by contributions from the public and that provided direct health and welfare services to individuals were eligible to participate in the CFC. Manual on Fund-Raising § 5.21 (1977).

Respondents in this case are the NAACP Legal Defense and Educational Fund, Inc., the Sierra Club Legal Defense Fund, the Puerto Rican Legal Defense and Education Fund, the Federally Employed Women Legal Defense and Education Fund, the Indian Law Resource Center, the Lawyers' Committee for Civil Rights under Law, and the Natural Resources Defense Council. Each of the respondents attempts to influence public policy through one or more of the following means: political activity, advocacy, lobbying, or litigation on behalf of others. In 1980, two of the respondents—the NAACP Legal Defense and Educational Fund, Inc., and the Puerto Rican Legal Defense and Education Fund (the Legal Defense Funds)—joined by the NAACP Special Contribution Fund, for the first time sought to participate in the CFC. The Office of Personnel Management (OPM), which in 1978 had assumed the duties of the Civil Service Commission, refused admission to the Legal Defense Funds. This action led to a series of three lawsuits, the third of which is before us today.

In the first action the Legal Defense Funds challenged the "direct services" requirement on the grounds that it violated the First Amendment and the equal protection component of the Fifth Amendment. *NAACP Legal Defense & Educational Fund, Inc.* v. *Campbell*, 504 F. Supp. 1365 (DC 1981) *(NAACP I)*. The District Court did not reach the equal protection challenge, because it found that the "direct services" requirement as formulated in the Manual on Fund-Raising was too vague to satisfy the strict standards of specificity required by the First Amendment. *Id.*, at 1368. The Government did not appeal the District Court's decision, and the plaintiffs, along with other legal defense funds, were allowed to participate in the 1982 and 1983 Campaigns and receive funds designated for their use by federal employees.

In the second proceeding, the Legal Defense Funds challenged the decision of the Director of OPM to authorize local federal coordinating groups to determine what share, if any,

of the undesignated funds to allocate to organizations classified as national service associations. *NAACP Legal Defense & Educational Fund, Inc.* v. *Devine*, 560 F. Supp. 667, 672 (DC 1983) *(NAACP II)*. The plaintiff legal defense funds categorized themselves as "national service associations," a category that OPM had defined as agencies having a domestic welfare service function which includes direct services to meet basic human welfare needs. Manual on Fund-Raising § 4.2(e). The District Court rejected claims that OPM's decision, which essentially permitted local coordinating groups to choose not to allocate undesignated funds to the Legal Defense Funds, violated their rights under the Due Process Clause and the First Amendment. 560 F. Supp., at 676. The court found that local coordinating groups must have flexibility to distribute funds in accordance with the intent of donors and the benefit to the local community. Due process was satisfied by the participation of national service associations in the process by which the local groups determined how to distribute funds. *Id.*, at 675. The court determined that the exclusion was necessary to protect the First Amendment rights of donors not to contribute to organizations whose purposes were inconsistent with their beliefs and to serve the Government's interest in ensuring that as much money as possible was received through the Campaign. *Id.*, at 675–676. The Legal Defense Funds did not appeal the decision.

In response to the District Court's decision in *NAACP I*, President Reagan took several steps to restore the CFC to what he determined to be its original purpose. In 1982, the President issued Executive Order No. 12353, 3 CFR 139 (1983), to replace the 1961 Executive Order which had established the CFC. The new Order retained the original limitation to "national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate," and delegated to the Director of the Office of Personnel Management the authority to establish criteria for determining appropriateness. Shortly thereafter, the President

amended Executive Order No. 12353 to specify the purposes of the CFC and to identify groups whose participation would be consistent with those purposes. Exec. Order No. 12404, 3 CFR 151 (1984). The CFC was designed to lessen the Government's burden in meeting human health and welfare needs by providing a convenient, nondisruptive channel for federal employees to contribute to nonpartisan agencies that directly serve those needs. *Id.*, § 1(b), amending Exec. Order No. 12353, § 2(b)(1). The Order limited participation to "voluntary, charitable, health and welfare agencies that provide or support direct health and welfare services to individuals or their families," *ibid.*, amending Exec. Order No. 12353, § 2(b)(2),[2] and specifically excluded those "[a]gencies that seek to influence the outcomes of elections or the determination of public policy through political activity or advocacy, lobbying, or litigation on behalf of parties other than themselves." *Ibid.*, amending Exec. Order No. 12353, § 2(b)(3).

Respondents brought this action challenging their threatened exclusion under the new Executive Order. They argued that the denial of the right to seek designated funds violates their First Amendment right to solicit charitable contributions and that the denial of the right to participate in undesignated funds violates their rights under the equal pro-

---

[2] "To meet [Campaign] objectives, eligibility for participation in the Combined Federal Campaign shall be limited to voluntary, charitable, health and welfare agencies that provide or support direct health and welfare services to individuals or their families. Such direct health and welfare services must be available to Federal employees in the local campaign solicitation area, unless they are rendered to needy persons overseas. Such services must directly benefit human beings, whether children, youth, adults, the aged, the ill and infirm, or the mentally or physically handicapped. Such services must consist of care, research or education in the fields of human health or social adjustment and rehabilitation; relief of victims of natural disasters and other emergencies; or assistance to those who are impoverished and therefore in need of food, shelter, clothing, education, and basic human welfare services." Exec. Order No. 12404, § 1(b), amending Exec. Order No. 12353, § 2(b)(2).

tection component of the Fifth Amendment. Respondents also contended that the "direct services" requirement in § 1(b) of the Executive Order suffered from the same vagueness problems as the requirement struck down in *NAACP I.* The District Court dismissed the vagueness challenge and the equal protection claim on ripeness grounds. *NAACP Legal Defense & Educational Fund, Inc.* v. *Devine,* 567 F. Supp. 401 (DC 1983) *(NAACP III).* Those rulings were not appealed and are not before us. The District Court also held that respondents' exclusion from the designated contribution portion of the CFC was unconstitutional. The court reasoned that the CFC was a "limited public forum" and that respondents' exclusion was content based. *Id.,* at 407. Finding that the regulation was not narrowly drawn to support a compelling governmental interest, the District Court granted summary judgment to respondents and enjoined the denial of respondents' pending or future applications to participate in the solicitation of designated contributions. *Id.,* at 410.

The judgment was affirmed by a divided panel of the United States Court of Appeals for the District of Columbia Circuit. *NAACP Legal Defense & Educational Fund, Inc.* v. *Devine,* 234 U. S. App. D. C. 148, 727 F. 2d 1247 (1984). The majority did not decide whether the CFC was a limited public forum or a nonpublic forum under *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37 (1983), because in its view the Government restrictions were not reasonable and therefore failed even the least exacting scrutiny. The dissent disagreed with both the analysis used and the result reached by the majority. 234 U. S. App. D. C., at 169, 727 F. 2d, at 1268 (Starr, J., dissenting). The dissent defined the relevant forum as the federal workplace and found that it was a nonpublic forum under our cases. Based on this characterization, the dissent argued that the Government must merely provide a rational basis for the exclusion, and that this standard was met here. An equally divided court denied the Government's request for rehearing en banc. App. to Pet. for Cert. 80a.

## II

The issue presented is whether respondents have a First Amendment right to solicit contributions that was violated by their exclusion from the CFC. To resolve this issue we must first decide whether solicitation in the context of the CFC is speech protected by the First Amendment, for, if it is not, we need go no further. Assuming that such solicitation is protected speech, we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic. Finally, we must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard. Applying this analysis, we find that respondents' solicitation is protected speech occurring in the context of a nonpublic forum and that the Government's reasons for excluding respondents from the CFC appear, at least facially, to satisfy the reasonableness standard. We express no opinion on the question whether petitioner's explanation is merely a pretext for viewpoint discrimination. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## A

Charitable solicitation of funds has been recognized by this Court as a form of protected speech. In *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980), the Court observed:

> "[S]oliciting funds involves interests protected by the First Amendment's guarantee of freedom of speech. *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council*, 425 U. S. 748, 761 (1976) . . . ." *Id.*, at 629.

> "Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps

persuasive speech seeking support for particular causes or for particular views . . . and for the reality that without solicitation the flow of such information and advocacy would likely cease. . . . Furthermore, . . . , it has not been dealt with in our cases as a variety of purely commercial speech." *Id.*, at 632.

See also *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 363 (1977).

In *Village of Schaumburg*, the Court struck down a local ordinance prohibiting solicitation in a public forum by charitable organizations that expended less than 75 percent of the receipts collected for charitable purposes. The plaintiff in that case was a public advocacy group that employed canvassers to distribute literature and answer questions about the group's goals and activities as well as to solicit contributions. The Court found that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests — communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment." 444 U. S., at 632. The ordinance was invalid, the Court held, because it unduly interfered with the exercise of protected rights.

Although *Village of Schaumburg* establishes that noncommercial solicitation is protected by the First Amendment, petitioner argues that solicitation within the confines of the CFC is entitled to a lesser degree of protection. This argument is premised on the inherent differences between the face-to-face solicitation involved in *Village of Schaumburg* and the 30-word written statements at issue here. In a face-to-face encounter there is a greater opportunity for the exchange of ideas and the propagation of views than is available in the CFC. The statements contained in the CFC literature are merely informative. Although prepared by the participants, the statements must conform to federal standards

which prohibit persuasive speech and the use of symbols "or other distractions" aimed at competing for the potential donor's attention.    5 CFR § 950.521(d) (1983).

Notwithstanding the significant distinctions between in-person solicitation and solicitation in the abbreviated context of the CFC, we find that the latter deserves First Amendment protection.    The brief statements in the CFC literature directly advance the speaker's interest in informing readers about its existence and its goals.    Moreover, an employee's contribution in response to a request for funds functions as a general expression of support for the recipient and its views. See *Buckley* v. *Valeo*, 424 U. S. 1, 21 (1976).    Although the CFC does not entail direct discourse between the solicitor and the donor, the CFC literature facilitates the dissemination of views and ideas by directing employees to the soliciting agency to obtain more extensive information.    5 CFR § 950.521(e)(ii) (1983).    Finally, without the funds obtained from solicitation in various fora, the organization's continuing ability to communicate its ideas and goals may be jeopardized.    See *Village of Schaumburg* v. *Citizens for a Better Environment, supra,* at 632.    Thus, the nexus between solicitation and the communication of information and advocacy of causes is present in the CFC as in other contexts.    Although Government restrictions on the length and content of the request are relevant to ascertaining the Government's intent as to the nature of the forum created, they do not negate the finding that the request implicates interests protected by the First Amendment.

### B

The conclusion that the solicitation which occurs in the CFC is protected speech merely begins our inquiry.    Even protected speech is not equally permissible in all places and at all times.    Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government prop-

erty without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. Cf. *Jones* v. *North Carolina Prisoners' Labor Union*, 433 U. S. 119, 136 (1977). Recognizing that the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," *Greer* v. *Spock*, 424 U. S. 828, 836 (1976), the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum. Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. See *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S., at 45. Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.*, at 46.

To determine whether the First Amendment permits the Government to exclude respondents from the CFC, we must first decide whether the forum consists of the federal workplace, as petitioner contends, or the CFC, as respondents maintain. Having defined the relevant forum, we must then determine whether it is public or nonpublic in nature.

Petitioner contends that a First Amendment forum necessarily consists of tangible government property. Because the only "property" involved here is the federal workplace, in petitioner's view the workplace constitutes the relevant

forum. Under this analysis, the CFC is merely an activity that takes place in the federal workplace. Respondents, in contrast, argue that the forum should be defined in terms of the access sought by the speaker. Under their view, the particular channel of communication constitutes the forum for First Amendment purposes. Because respondents seek access only to the CFC and do not claim a general right to engage in face-to-face solicitation in the federal workplace, they contend that the relevant forum is the CFC and its attendant literature.

We agree with respondents that the relevant forum for our purposes is the CFC. Although petitioner is correct that as an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. See, e. g., *Greer* v. *Spock, supra.* In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property. For example, *Perry Education Assn.* v. *Perry Local Educators' Assn., supra,* examined the access sought by the speaker and defined the forum as a school's internal mail system and the teachers' mailboxes, notwithstanding that an "internal mail system" lacks a physical situs. Similarly, in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 300 (1974), where petitioners sought to compel the city to permit political advertising on city-owned buses, the Court treated the advertising spaces on the buses as the forum. Here, as in *Perry Education Assn.,* respondents seek access to a particular means of communication. Consistent with the approach taken in prior cases, we find that the CFC, rather than the federal workplace, is the forum. This conclusion does not mean,

however, that the Court will ignore the special nature and function of the federal workplace in evaluating the limits that may be imposed on an organization's right to participate in the CFC. See *Perry Education Assn.* v. *Perry Local Educators' Assn., supra,* at 44.

Having identified the forum as the CFC, we must decide whether it is nonpublic or public in nature. Most relevant in this regard, of course, is *Perry Education Assn.* There the Court identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum. Traditional public fora are those places which "by long tradition or by government fiat have been devoted to assembly and debate." 460 U. S., at 45. Public streets and parks fall into this category. See *Hague* v. *CIO,* 307 U. S. 496, 515 (1939). In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. *Perry Education Assn., supra,* at 45 and 46, n. 7. Of course, the government "is not required to indefinitely retain the open character of the facility." *Id.,* at 46.

The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. *Ibid.* Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. *Ibid.* The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent. For example, in *Widmar* v. *Vincent,* 454 U. S. 263 (1981), we found that a state university that had an express policy of making its meeting facilities available to registered student groups had created a public forum for their use. *Id.,* at 267. The policy evidenced a clear intent to create a public forum, not-

withstanding the University's erroneous conclusion that the Establishment Clause required the exclusion of groups meeting for religious purposes. Additionally, we noted that a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum. *Id.*, at 267, n. 5. And in *Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976), the Court held that a forum for citizen involvement was created by a state statute providing for open school board meetings. *Id.*, at 174, n. 6. Similarly, the Court found a public forum where a municipal auditorium and a city-leased theater were designed for and dedicated to expressive activities. *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 555 (1975).

Not every instrumentality used for communication, however, is a traditional public forum or a public forum by designation. *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S. 114, 130, n. 6 (1981). "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.*, at 129. We will not find that a public forum has been created in the face of clear evidence of a contrary intent, see *ibid.*, nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity. See, *e. g.*, *Jones* v. *North Carolina Prisoners' Labor Union*, 433 U. S. 119 (1977). In *Perry Education Assn.*, we found that the School District's internal mail system was not a public forum. In contrast to the general access policy in *Widmar*, school board policy did not grant general access to the school mail system. The practice was to require permission from the individual school principal before access to the system to communicate with teachers was granted. Similarly, the evidence in *Lehman* v. *City of Shaker Heights*, 418 U. S. 298 (1974), revealed that the city intended to limit access to the advertising spaces on city transit buses. It had done so for 26 years, and

its management contract required the managing company to exercise control over the subject matter of the displays. *Id.,* at 299–300. Additionally, the Court found that the city's use of the property as a commercial enterprise was inconsistent with an intent to designate the car cards as a public forum. In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum. Accordingly, we have held that military reservations, *Greer* v. *Spock,* 424 U. S. 828 (1976), and jailhouse grounds, *Adderley* v. *Florida,* 385 U. S. 39 (1966), do not constitute public fora.

Here the parties agree that neither the CFC nor the federal workplace is a traditional public forum. Respondents argue, however, that the Government created a limited public forum for use by all charitable organizations to solicit funds from federal employees. Petitioner contends, and we agree, that neither its practice nor its policy is consistent with an intent to designate the CFC as a public forum open to all tax-exempt organizations. In 1980, an estimated 850,000 organizations qualified for tax-exempt status. H. Godfrey, Handbook on Tax Exempt Organizations 5 (1983). In contrast, only 237 organizations participated in the 1981 CFC of the National Capital Area. 1981 Combined Federal Campaign Contributor's Leaflet, National Capital Area. The Government's consistent policy has been to limit participation in the CFC to "appropriate" voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials. Although the record does not show how many organizations have been denied permission throughout the 24-year history of the CFC, there is no evidence suggesting that the granting of the requisite permission is merely ministerial. Cf. *Perry Education Assn.,* 460 U. S., at 47. The Civil Service Commission and, after 1978, the Office of Personnel Management developed extensive admission criteria to limit access to the Campaign to

those organizations considered appropriate. See Manual on Fund-Raising, ch. 5, and 5 CFR pt. 950 (1983). Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum. See *Greer* v. *Spock, supra,* at 838, n. 10.

Nor does the history of the CFC support a finding that the Government was motivated by an affirmative desire to provide an open forum for charitable solicitation in the federal workplace when it began the Campaign. The historical background indicates that the Campaign was designed to minimize the disruption to the workplace that had resulted from unlimited ad hoc solicitation activities by *lessening* the amount of expressive activity occurring on federal property. Indeed, the OPM stringently limited expression to the 30-word statement included in the Campaign literature. The decision of the Government to limit access to the CFC is not dispositive in itself; instead, it is relevant for what it suggests about the Government's intent in creating the forum. The Government did not create the CFC for purposes of providing a forum for expressive activity. That such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes. See *United States Postal Service* v. *Council of Greenburgh Civic Assns., supra,* at 130, n. 6, and cases cited therein.

An examination of the nature of the Government property involved strengthens the conclusion that the CFC is a non-public forum. Cf. *Greer* v. *Spock, supra,* at 838 ("[T]he business of a military installation [is] to train soldiers, not to provide a public forum"). The federal workplace, like any place of employment, exists to accomplish the business of the employer. Cf. *Connick* v. *Myers,* 461 U. S. 138, 150–151 (1983). "[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." *Arnett* v. *Kennedy,* 416 U. S. 134, 168 (1974) (POWELL, J., concurring in part). It follows that the

Government has the right to exercise control over access to the federal workplace in order to avoid interruptions to the performance of the duties of its employees. Cf. *United States Postal Service* v. *Council of Greenburgh Civic Assns.*, 453 U. S., at 128–129. In light of the Government policy in creating the CFC and its practice in limiting access, we conclude that the CFC is a nonpublic forum.

## C

Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. *Perry Education Assn., supra,* at 49. Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, see *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974), or if he is not a member of the class of speakers for whose especial benefit the forum was created, see *Perry Education Assn., supra,* the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject. The Court of Appeals found it unnecessary to resolve whether the government's denial of access to respondents was viewpoint based, because it determined that respondents' exclusion was unreasonable in light of the purpose served by the CFC.

Petitioner maintains that the purpose of the CFC is to provide a means for traditional health and welfare charities to solicit contributions in the federal workplace, while at the same time maximizing private support of social programs that would otherwise have to be supported by Government funds and minimizing costs to the Federal Government by controlling the time that federal employees expend on the Campaign. Petitioner posits that excluding agencies that attempt to influence the outcome of political elections or the determination of public policy is reasonable in light of this

purpose. First, petitioner contends that there is likely to be a general consensus among employees that traditional health and welfare charities are worthwhile, as compared with the more diverse views concerning the goals of organizations like respondents. Limiting participation to widely accepted groups is likely to contribute significantly to employees' acceptance of the Campaign and consequently to its ultimate success. In addition, because the CFC is conducted largely through the efforts of federal employees during their working hours, any controversy surrounding the CFC would produce unwelcome disruption. Finally, the President determined that agencies seeking to affect the outcome of elections or the determination of public policy should be denied access to the CFC in order to avoid the reality and the appearance of Government favoritism or entanglement with particular viewpoints. In such circumstances, petitioner contends that the decision to deny access to such groups was reasonable.

In respondents' view, the reasonableness standard is satisfied only when there is some basic incompatibility between the communication at issue and the principal activity occurring on the Government property. Respondents contend that the purpose of the CFC is to permit solicitation by groups that provide health and welfare services. By permitting such solicitation to take place in the federal workplace, respondents maintain, the Government has concluded that such activity is consistent with the activities usually conducted there. Because respondents are seeking to solicit such contributions and their activities result in direct, tangible benefits to the groups they represent, the Government's attempt to exclude them is unreasonable. Respondents reject petitioner's justifications on the ground that they are unsupported by the record.

The Court of Appeals accepted the position advanced by respondents. When the excluded and included speakers share a similar "status," the court asserted that a heightened reasonableness inquiry is appropriate. Here the status of

respondents, in the court's view, is analogous to that of tradi-
tional health and welfare organizations, because both provide
direct health and welfare services and are tax exempt under
26 U. S. C. § 501(c)(3).   234 U. S. App. D. C., at 159, 727
F. 2d, at 1258.   In such circumstances, the Court of Appeals
believed that the Government's decision to exclude some
speakers from the nonpublic forum is reasonable only if the
exclusion furthers a legitimate Government interest and that
interest adequately accounts for the differential treatment
accorded the speakers.   *Id.*, at 160, 727 F. 2d, at 1259.

Under this test, the Court of Appeals rejected petitioner's
justifications as unreasonable.   The court agreed that assist-
ance to the needy is a laudable goal, but noted that respond-
ents further this goal because their litigation efforts achieved
direct benefits for many low-income persons.   *Id.*, at 161,
727 F. 2d, at 1260.   It also agreed that avoiding the appear-
ance of federal support for partisan causes is a legitimate
interest, but rejected it as a justification in this case be-
cause the Tax Code does not define legal defense funds as
political advocacy groups.   *Ibid.*   Relying principally on
public forum cases, the court declined to accept the rationale
that exclusion could be premised on the Government's inter-
est in minimizing disruption in the workplace and maximizing
the success of the Campaign.   *Id.*, at 162–163, 727 F. 2d, at
1261–1262.

Based on the present record, we disagree and conclude
that respondents may be excluded from the CFC.   The
Court of Appeals' conclusion to the contrary fails to reflect
the nature of a nonpublic forum.   The Government's decision
to restrict access to a nonpublic forum need only be *reason-
able;* it need not be the most reasonable or the only reason-
able limitation.   In contrast to a public forum, a finding of
strict incompatibility between the nature of the speech or the
identity of the speaker and the functioning of the nonpublic
forum is not mandated.   Cf. *Perry Education Assn.* v. *Perry
Local Educators' Assn.*, 460 U. S. 37 (1983); *Lehman* v. *City*

*of Shaker Heights,* 418 U. S. 298 (1974). Even if some incompatibility with general expressive activity were required, the CFC would meet the requirement because it would be administratively unmanageable if access could not be curtailed in a reasonable manner. Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling. The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. See *United States Postal Service* v. *Council of Greenburgh Civic Assns.,* 453 U. S., at 129. Rarely will a nonpublic forum provide the only means of contact with a particular audience. Here, as in *Perry Education Assn., supra,* at 53–54, the speakers have access to alternative channels, including direct mail and in-person solicitation outside the workplace, to solicit contributions from federal employees.

The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances. Here the President could reasonably conclude that a dollar directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on litigation that might or might not result in aid to the needy. Moreover, avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum. See *Greer* v. *Spock,* 424 U. S., at 839; *Lehman* v. *City of Shaker Heights, supra,* at 304. In furthering this interest, the Government is not bound by decisions of other executive agencies made in other contexts. Thus, respondents' tax status, while perhaps relevant, does not determine the reasonableness of the Government's conclusion that participation by such agencies in the CFC will create the appearance of favoritism.

The Court of Appeals' rejection of the Government's interest in avoiding controversy that would disrupt the workplace and adversely affect the Campaign is inconsistent with our

prior cases. In *Perry Education Assn., supra,* at 52, we noted that "exclusion of the rival union may reasonably be considered a means of insuring labor peace within the schools." Similarly, the exclusion of respondents may reasonably be considered a means of "insuring peace" in the federal workplace. Inasmuch as the Court of Appeals rejected this reason for lack of conclusive proof of an actual effect on the workplace, it ignored the teachings of this Court that the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum. 460 U. S., at 52, n. 12.

Finally, the record amply supports an inference that respondents' participation in the CFC jeopardized the success of the Campaign. OPM submitted a number of letters from federal employees and managers, as well as from Chairmen of local Federal Coordinating Committees and Members of Congress expressing concern about the inclusion of groups termed "political" or "nontraditional" in the CFC. More than 80 percent of this correspondence related requests that the CFC be restricted to "non-political," "non-advocacy," or "traditional" charitable organizations. Deposition of P. Kent Bailey, Program Analyst for OPM, App. 275, 276. In addition, OPM received approximately 1,450 telephone calls complaining about the inclusion of respondents and similar agencies in the 1983 Campaign. *Id.,* at 286. Many Campaign workers indicated that extra effort was required to persuade disgruntled employees to contribute. *Id.,* at 287. The evidence indicated that the number of contributors had declined in some areas. *Id.,* at 305. Other areas reported significant declines in the amount of contributions. See Executive. Orders 12353 and 12404 as they Regulate the Combined Federal Campaign (Part 1), Hearing before the House Committee on Government Operations, 89th Cong., 1st Sess., 67 (1983) (statement of Donald J. Devine, Director, OPM). Thus, the record adequately supported petitioner's position that respondents' continued participation in the Campaign would be detrimental to the Campaign and disruptive of the federal

workplace. Although the avoidance of controversy is not a valid ground for restricting speech in a public forum, a nonpublic forum by definition is not dedicated to general debate or the free exchange of ideas. The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.

## D

On this record, the Government's posited justifications for denying respondents access to the CFC appear to be reasonable in light of the purpose of the CFC. The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination. See *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S., at 49; cf. *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984). Although both the District Court and the Court of Appeals alluded to the argument that the Government excluded respondents in an attempt to suppress their points of view, neither court made a finding on the issue. The District Court erroneously characterized the CFC as a limited public forum and concluded that respondents' exclusion was impermissibly content based, because the statements in the CFC literature as to how the contributions would be used caused the controversy that ultimately led to respondents' exclusion. 567 F. Supp., at 407. The District Court, therefore, did not reach petitioner's argument that the exclusion was viewpoint neutral. *Ibid.* Also declining to decide the issue, the Court of Appeals suggested that respondents may have been excluded because petitioner simply disagreed with their viewpoints. 234 U. S. App. D. C., at 157, 160, n. 12, 727 F. 2d, at 1256, 1259, n. 12. The Court of Appeals found it unnecessary to resolve the issue, because it concluded that the exclusion was unreasonable.

Petitioner argues that a decision to exclude all advocacy groups, regardless of political or philosophical orientation, is

by definition viewpoint neutral. Brief for Petitioner 30. Exclusion of groups advocating the use of litigation is not viewpoint-based, petitioner asserts, because litigation is a means of promoting a viewpoint, not a viewpoint in itself. *Id.*, at 30–31, n. 23. While we accept the validity and reasonableness of the justifications offered by petitioner for excluding advocacy groups from the CFC, those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view. Cf. *Village of Schaumburg* v. *Citizens for a Better Environment*, 444 U. S., at 634.

Petitioner contends that controversial groups must be eliminated from the CFC to avoid disruption and ensure the success of the Campaign. As noted *supra*, we agree that these are facially neutral and valid justifications for exclusion from the nonpublic forum created by the CFC. Nonetheless, the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers. In addition, petitioner maintains that limiting CFC participation to organizations that provide direct health and welfare services to needy persons is necessary to achieve the goals of the CFC as set forth in Executive Order 12404. Although this concern is also sufficient to provide reasonable grounds for excluding certain groups from the CFC, respondents offered some evidence to cast doubt on its genuineness. Organizations that do not provide direct health and welfare services, such as the World Wildlife Fund, the Wilderness Society, and the United States Olympic Committee, have been permitted to participate in the CFC. App. 427–428. Although there is no requirement that regulations limiting access to a nonpublic forum must be precisely tailored, the issue whether the Government excluded respondents because it disagreed with their viewpoints was neither decided below nor fully briefed before this Court. We decline to decide in the first instance whether the exclusion of respondents was impermissibly motivated by

a desire to suppress a particular point of view. Respondents are free to pursue this contention on remand.

## III

We conclude that the Government does not violate the First Amendment when it limits participation in the CFC in order to minimize disruption to the federal workplace, to ensure the success of the fundraising effort, or to avoid the appearance of political favoritism without regard to the viewpoint of the excluded groups. Accordingly, we reverse the judgment of the Court of Appeals that the exclusion of respondents was unreasonable, and we remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL took no part in the consideration or decision of this case. JUSTICE POWELL took no part in the decision of this case.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN joins, dissenting.

I agree with the Court that the Combined Federal Campaign (CFC) is not a traditional public forum. I also agree with the Court that our precedents indicate that the Government may create a "forum by designation" (or, to use the term our cases have adopted,[1] a "limited public forum") by allowing public property that traditionally has not been available for assembly and debate to be used as a place for expressive activity by certain speakers or about certain subjects. I cannot accept, however, the Court's circular reasoning that the CFC is not a limited public forum because the

_____

[1] See, *e. g.*, *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 48 (1983); *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 655 (1981).

Government intended to limit the forum to a particular class of speakers. Nor can I agree with the Court's conclusion that distinctions the Government makes between speakers in defining the limits of a forum need not be narrowly tailored and necessary to achieve a compelling governmental interest. Finally, I would hold that the exclusion of the several respondents from the CFC was, on its face, viewpoint-based discrimination. Accordingly, I dissent.

## I

The Court recognizes that its decisions regarding the right of a citizen to engage in expressive activity on public property generally have divided public property into three categories—public forums, limited public forums, and nonpublic forums. The Court also concedes, as it must, that "a public forum . . . created by government designation of a place or channel of communication for use by the public at large for assembly and speech, *for use by certain speakers*, or for the discussion of certain subjects" is a limited public forum. *Ante*, at 802 (emphasis added). It nevertheless goes on to find that the CFC is not a limited public forum precisely because the "Government's consistent policy has been to limit participation in the CFC" to certain speakers. *Ante*, at 804. Because the Government intended to exclude some speakers from the CFC, the Court continues, the Government may exclude any speaker from the CFC on any "reasonable" ground, except viewpoint discrimination. In essence, the Court today holds that the First Amendment's guarantee of free speech and assembly, a "fundamental principle of the American government," *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring), reduces to this: when the Government acts as the holder of public property other than streets, parks, and similar places, the Government may do whatever it reasonably intends to do, so long as it does not intend to suppress a particular viewpoint.

The Court's analysis transforms the First Amendment into a mere ban on viewpoint censorship, ignores the principles underlying the public forum doctrine, flies in the face of the decisions in which the Court has identified property as a limited public forum, and empties the limited-public-forum concept of all its meaning.

## A

The public forum doctrine arose out of the Court's efforts to address the recurring and troublesome issue of when the First Amendment gives an individual or group the right to engage in expressive activity on government property. See, *e. g.*, *Perry Education Assn.* v.. *Perry Local Educators' Assn.*, 460 U. S. 37 (1983); *Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975); *Tinker* v. *Des Moines Independent Community School District*, 393 U. S. 503 (1969); *Brown* v. *Louisiana*, 383 U. S. 131 (1966); *Hague* v. *CIO*, 307 U. S. 496 (1939).

Access to government property can be crucially important to those who wish to exercise their First Amendment rights. Government property often provides the only space suitable for large gatherings, and it often attracts audiences that are otherwise difficult to reach. Access to government property permits the use of the less costly means of communication so "essential to the poorly financed causes of little people," *Martin* v. *Struthers*, 319 U. S. 141, 146 (1943), and "allow[s] challenge to governmental action at its locus." Cass, First Amendment Access to Government Facilities, 65 Va. L. Rev. 1287, 1288 (1979).

In addition to furthering the First Amendment rights of individuals, the use of government property for expressive activity helps further the interests that freedom of speech serves for society as a whole: it allows the "uninhibited, robust, and wide-open" debate about matters of public importance that secures an informed citizenry, *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964); it permits "the

continued building of our politics and culture," *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972); it facilitates political and societal changes through peaceful and lawful means, see *Carey* v. *Brown*, 447 U. S. 455, 467 (1980); and it helps to ensure that government is "responsive to the will of the people," *Stromberg* v. *California*, 283 U. S. 359, 369 (1931).

At the same time, however, expressive activity on government property may interfere with other important activities for which the property is used. Accordingly, in answering the question whether a person has a right to engage in expressive activity on government property, the Court has recognized that the person's right to speak and the interests that such speech serves for society as a whole must be balanced against the "other interests inhering in the uses to which the public property is normally put." *Adderley* v. *Florida*, 385 U. S. 39, 54 (1966) (dissenting opinion); see also *Carey* v. *Brown*, 447 U. S., at 470; *Cox* v. *New Hampshire*, 312 U. S. 569, 574 (1941).

The result of such balancing will depend, of course, upon the nature and strength of the various interests, which in turn depend upon such factors as the nature of the property, the relationship between the property and the message the speaker wishes to convey, and any special features of the forum that make it especially desirable or undesirable for the particular expressive activity. Broad generalizations about the proper balance are, for the most part, impossible. The Court has stated one firm guideline, however: the First Amendment does not guarantee that one may engage in expressive activity on government property when the expressive activity would be incompatible with important purposes of the property. *Grayned* v. *City of Rockford*, 408 U. S. 104, 116–117 (1972); see also *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114, 130, n. 6 (1981); *Carey* v. *Brown*, 447 U. S., at 470; *Greer* v. *Spock*, 424 U. S. 828, 843 (1976) (POWELL, J., concurring).

In applying that principle, the Court has found that public places generally may be divided into three categories. The first, the "quintessential public forums," includes those places "which by long tradition or by government fiat have been devoted to assembly and debate," such as parks, streets, and sidewalks. *Perry*, 460 U. S., at 45; see also *United States* v. *Grace*, 461 U. S. 171, 177 (1983). In those places, expressive activity will rarely be incompatible with the intended use of the property, as is evident from the facts that they are "natural and proper places for dissemination of information and opinion," *Schneider* v. *State*, 308 U. S. 147, 163 (1939), and from "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO*, 307 U. S., at 515.

The second category, which we have referred to as "limited public forums," consists primarily of government property which the government has opened for use as a place for expressive activity for a limited amount of time, *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 655 (1981), or for a limited class of speakers, *Widmar* v. *Vincent, supra*, or for a limited number of topics, *Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167, 175, n. 8 (1976). See *Perry*, 460 U. S., at 45–46, and n. 7. In a limited public forum, it is not history or tradition, but the government's own acquiescence in the use of the property as a forum for expressive activity that tells us that such activity is compatible with the uses to which the place is normally put.

In both public and limited public forums, because at least some types of expressive activity obviously are compatible with the normal uses of the property, the Court has recognized that people generally have a First Amendment right to engage in expressive activity upon the property. As noted above, however, the Court has observed that the right to engage in expressive activity on public property is not absolute,

and must be balanced against interests served by the other uses to which the property is put. Accordingly, the Court has held that the government may regulate the time, place, and manner of the expressive activity in order to accommodate the "interest of all" members of the public to enjoy the use of the public space, *Hague* v. *CIO*, 307 U. S., at 516, and in order to treat fairly all those who have an equal right to speak on the property. *Cox* v. *New Hampshire*, 312 U. S., at 574. Such restrictions must be "justified without reference to the content of the regulated speech," be "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293 (1984); *United States* v. *Grace*, 461 U. S., at 177; *Perry*, 460 U. S., at 45; *Heffron*, 452 U. S., at 647–648.

The Court has held that regulations other than time, place, and manner restrictions must be necessary to serve a compelling governmental interest and must be narrowly tailored to achieve that purpose. *Perry*, 460 U. S., at 45; see also *Carey* v. *Brown*, 447 U. S., at 465; *Police Department of Chicago* v. *Mosley*, 408 U. S., at 96–97. Again, however, because First Amendment rights must be "applied in light of the special characteristics of the . . . environment," *Tinker*, 393 U. S., at 506, the Court has recognized that a regulation that would not survive scrutiny if applied in the context of a public forum sometimes will be allowed in the context of a limited public forum. Restrictions based on the subject matter of the speech, for example, will almost never be justified in a public forum such as a park, but will more often be justified as necessary to reserve the limited public forum to expressive activity compatible with the property. See, *e. g.*, *Madison Joint School District*, 429 U. S., at 175, n. 8. In a traditional public forum, the government rarely could offer as a compelling interest the need to reserve the property for its normal uses, because expressive activity of all types traditionally has been a normal use of the property.

In a limited public forum, on the other hand, the need to confine expressive activity on the property to that which is compatible with the intended uses of the property will be a compelling interest that may justify distinctions made between speakers.

The third category, nonpublic forums, consists of property that is not compatible with general expressive activity. In those places, the government is not required to allow expressive activity. Of course, there often will be some such activity on the property by persons other than those, such as the government's own employees, who "belong" there. Some "outsiders" may be participants "in the forum's official business," and therefore may be allowed to use the property for expressive activity that furthers that business. See *Perry*, 460 U. S., at 53. Others may be provided access to the property by the government because it believes they will further the goals the government uses the property to serve. See, *e. g., Jones* v. *North Carolina Prisoners' Labor Union*, 433 U. S. 119, 133 (1977). Distinctions between those speakers allowed access and those not allowed access must be viewpoint neutral, just as if the property were a traditional or limited public forum. *Perry*, 460 U. S., at 46. The Court has recognized, however, that reasonable and viewpoint-neutral distinctions between speakers that "relate to the special purpose for which the property is used" generally "are inherent and inescapable in the process of limiting the nonpublic forum to activities compatible with the intended purpose of the property." *Id.*, at 55, 49.

The line between limited public forums and nonpublic forums "may blur at the edges," and is really more in the nature of a continuum than a definite demarcation. Cf. *United States Postal Service* v. *Greenburg Civic Assns.*, 453 U. S., at 132 (the line between defining the forum and regulating the time, place, and manner of expressive activity in the forum blurs at the edges). The government may invite speakers to a nonpublic forum to an extent that the forum

comes to be a limited public forum because it becomes obvious that some types of expressive activity are not incompatible with the forum. For example, the fact that the Government occasionally may invite a speaker to a military base to lecture on drug abuse does not support the inference that it would be compatible with the purposes of the base to provide a forum for all speakers, or even for all those who wish to speak on drug abuse. *Greer* v. *Spock*, 424 U. S. 828 (1976). But if the base sponsored a drug abuse prevention day, and invited many organizations to set up displays or information booths, the claim of a similar, uninvited group that the Government had established a limited public forum would be on much firmer ground.

Further, the three categories are not exclusive. There are instances in which property has not traditionally been used for a particular form of expressive activity, and the government has not acquiesced, but the Court's examination of the nature of the forum and the nature of the expressive activity led it to conclude that the activity was compatible with normal uses of the property and was to be allowed. See, *e. g.*, *Brown* v. *Louisiana*, 383 U. S. 131, 142 (1966) (plurality opinion); *id.*, at 148 (BRENNAN, J., concurring in judgment); *id.*, at 150 (WHITE, J., concurring in result).

Thus, the public forum, limited-public-forum, and nonpublic forum categories are but analytical shorthand for the principles that have guided the Court's decisions regarding claims to access to public property for expressive activity. The interests served by the expressive activity must be balanced against the interests served by the uses for which the property was intended and the interests of all citizens to enjoy the property. Where an examination of all the relevant interests indicates that certain expressive activity is not compatible with the normal uses of the property, the First Amendment does not require the government to allow that activity.

The Court's analysis, it seems to me, turns these principles on end. Rather than recognize that a nonpublic forum is a

place where expressive activity would be incompatible with the purposes the property is intended to serve, the Court states that a nonpublic forum is a place where we need not even be concerned about whether expressive activity is incompatible with the purposes of the property. Rather than taking the nature of the property into account in balancing the First Amendment interests of the speaker and society's interests in freedom of speech against the interests served by reserving the property to its normal use, the Court simply labels the property and dispenses with the balancing.

The Court, of course, has recognized that the "First Amendment prohibits Congress from 'abridging freedom of speech, or of the press,' and its ramifications are not confined to the 'public forum.'" *United States Postal Service* v. *Greenburg Civic Assns.*, 453 U. S., at 131, n. 7. Nevertheless, it holds today that outside the "public forum," into which it collapses the limited-public-forum category, see *infra*, at 825, the constraint imposed upon the Government is nothing more than a rational-basis requirement. The Court offers no explanation why attaching the label "nonpublic forum" to particular property frees the Government of the more stringent constraints imposed by the First Amendment in other contexts. The Government's interests in being able to use the property for the purposes for which it was intended obviously are important; that is why a compatibility requirement is imposed. But the Government's interests as property holder are hardly more important than its interests as the keeper of our military forces, as guardian of our federal elections, as administrator of our prisons, as educator, or as employer. When the Government acts in those capacities, we closely scrutinize its justifications for infringements upon expressive activity. See, *e. g., Wayte* v. *United States*, 470 U. S. 598, 611 (1985); *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976); *Procunier* v. *Martinez*, 416 U. S. 396, 413–414 (1974); *Healy* v. *James*, 408 U. S. 169 (1972); *Pickering* v. *Board of Education*, 391 U. S. 563

(1968); *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968). Similarly, the mere fact that the Government acts as property owner should not exempt it from the First Amendment.

Nor should tradition or governmental "designation" be completely determinative of the rights of a citizen to speak on public property. Many places that are natural sites for expressive activity have no long tradition of use for expressive activity. Airports, for example, are a relatively recent phenomenon, as are government-sponsored shopping centers. Other public places may have no history of expressive activity because only recently have they become associated with the issue that citizens wish to use the property to discuss. It is likely that the library in *Brown* v. *Louisiana, supra,* historically had not been used for demonstrations for the obvious reason that its association with the subject of segregation became a topic of public protest only during the civil rights movement.[2] Another reason a particular parcel of property may have little history of expressive use is that the Government has excluded expressive activity from the property unjustifiably. Cf. *United States* v. *Grace,* 461 U. S., at 180.

The guarantees of the First Amendment should not turn entirely on either an accident of history or the grace of the Government. Thus, the fact that the Government "owns" the property to which a citizen seeks access for expressive activity does not dispose of the First Amendment claim; it requires that we balance the First Amendment interests of those who seek access for expressive activity against the interests of the other users of the property and the interests served by reserving the property for its intended uses. The Court's analysis forsakes that balancing, and abandons the compatibility test that always has served as a threshold indicator of the proper balance.

---

[2] See generally Note, A Unitary Approach to Claims of First Amendment Access to Publicly Owned Property, 35 Stan. L. Rev. 121, 137 (1982).

## B

Not only does the Court err in labeling the CFC a nonpublic forum without first engaging in a compatibility inquiry, but it errs as well in reasoning that the CFC is not a limited public forum because the Government permitted only "limited discourse," rather than "intentionally opening" the CFC for "public discourse." *Ante*, at 802. That reasoning is at odds with the cases in which the Court has found public property to be a limited public forum. Just as the Government's "consistent policy has been to limit participation in the CFC to 'appropriate' voluntary agencies and to require agencies seeking admission to obtain permission" from the relevant officials, *ante*, at 804, the theater in *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975), limited the use of its facilities to "clean, healthful entertainment which will make for the upbuilding of a better citizenship" and required productions wishing to use the theater to obtain permission of the relevant officials. See *id.*, at 549, n. 4. Under the Court's reasoning, therefore, the theater in *Southeastern Promotions* would not have been a limited public forum. Similarly, the university meeting rooms in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), despite the Court's disclaimer, *ante*, at 802–803, would not have been a limited public forum by the Court's reasoning, because the University had a policy of "selective access" whereby only registered nonreligious student groups, not religious student groups or the public at large, were allowed to meet in the rooms.[3]

---

[3] Other cases in which this Court has found that the First Amendment prohibited regulations restricting expressive activity in a public place also are inexplicable under the Court's analysis. By the Court's reasoning, there would have been no basis for the holding in *Tinker* v. *Des Moines Independent Community School District*, 393 U. S. 503 (1969), that the First Amendment protects the right of high school students to wear armbands protesting the "hostilities in Vietnam." *Id.*, at 504. Schools have never been identified as "quintessential public forums" like parks, and they practice a policy of selective access, because they are not open to students

Nor does the Court's reasoning find support in those cases where the Court has rejected the claim that a particular property was a limited public forum. In *Perry*, for example, the Court assumed, *arguendo*, that by allowing groups such as the Cub Scouts to use its mail system, the school might have created a limited public forum for such organizations, even though the school clearly had no intent to open up the mail system for general "public discourse." 460 U. S., at 48. In *Greer* v. *Spock*, the Court stated that the fact that the military base had decided that lectures on drug abuse would be "supportive of the military mission . . . did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever." 424 U. S., at 838, n. 10. In his concurring opinion in that case, JUSTICE POWELL made clear that this conclusion followed from the principle that the Court had to examine whether there was a "functional and symbolic incompatibility" between the particular expressive activity at issue and the " 'specialized society separate from civilian society' . . . that has its home on the base." *Id.*, at 844, quoting *Parker* v. *Levy*, 417 U. S. 733, 743 (1974).

Finally, in *Jones* v. *North Carolina Prisoners' Labor Union*, in rejecting the claim that the grant of access to the Jaycees and Alcoholics Anonymous transformed a prison into a public forum, the Court again did not look merely to whether that grant of access indicated an intent to open the prison "for public discourse." Instead, it engaged in an explicit balancing of the various interests involved, and, relying particularly on the special deference due the informed discretion of prison officials, concluded that "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation [between those

--------

and nonstudents alike. Under the Court's analysis, it would follow that "a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Ante*, at 808. But *Tinker* required precisely such a showing of incompatibility. 393 U. S., at 509.

allowed access and those denied access] is necessary to avoid an imminent threat of institutional disruption or violence." 433 U. S., at 136.

C

The Court's analysis empties the limited-public-forum concept of meaning and collapses the three categories of public forum, limited public forum, and nonpublic forum into two. The Court makes it *virtually* impossible to prove that a forum restricted to a particular class of speakers is a limited public forum. If the Government does not create a limited public forum unless it intends to provide an "open forum" for expressive activity, and if the exclusion of some speakers is evidence that the Government did not intend to create such a forum, *ante*, at 804–805, no speaker challenging denial of access will ever be able to prove that the forum is a limited public forum. The very fact that the Government denied access to the speaker indicates that the Government did not intend to provide an open forum for expressive activity, and under the Court's analysis that fact alone would demonstrate that the forum is not a limited public forum.

Further, the Court today explicitly redefines a limited public forum as a place which the Government intentionally opens "for public discourse." *Ante*, at 802. But traditional public forums are "places which by long tradition or *by government fiat* have been devoted to assembly and debate." *Perry*, 460 U. S., at 45 (emphasis added). I fail to see how the Court's new definition of limited public forums distinguishes them from public forums.

II

A

The Court's strained efforts to avoid recognizing that the CFC is a limited public forum obscure the real issue in this case: what constraint does the First Amendment impose upon the Government's efforts to define the boundaries of a limited public forum? While I do not agree with the Court

that the Government's consistent policy has been to limit access to the CFC to "traditional" charities through "extensive" eligibility criteria, the Government did indeed adopt eligibility criteria in 1983 specifically designed to exclude respondents. Exec. Order No. 12404, 3 CFR 151 (1984). Accordingly, the central question presented is whether those criteria need be anything more than rational.

The Court has said that access to a limited public forum extends only to "other entities of similar character." *Perry*, 460 U. S., at 48. It never has indicated, however, that the First Amendment imposes no limits on the government's power to define which speakers are of "similar character" to those already allowed access. Obviously, if the government's ability to define the boundaries of a limited public forum is unconstrained, the limited-public-forum concept is meaningless. Under that reasoning, the defendants in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), would have been allowed to define the University's meeting places as limited to speakers of similar character to "nonreligious" groups; the defendants in *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975) would have been allowed to define their theater as limited to plays of similar character to "clean, healthful entertainment"; and the school board in *Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976), would have been allowed to limit discussion of labor matters to persons similar in character to union representatives.

The constraints the First Amendment imposes upon the government's definition of the boundaries of a limited public forum follow from the principles underlying the public and limited-public-forum doctrine. As noted, the government's acquiescence in the use of property for expressive activity indicates that at least some expressive activity is compatible with the intended uses of the public property. If the government draws the boundaries of the forum to exclude expressive activity that is incompatible with the property, and to

include that which is compatible, the boundaries will reflect precisely the balancing of interests the public forum doctrine was meant to encapsulate. If the government draws the line at a point which excludes speech that would be compatible with the intended uses of the property, however, then the government must explain how its exclusion of compatible speech is necessary to serve, and is narrowly tailored to serve, some compelling governmental interest other than preserving the property for its intended uses.

### B

Petitioner does not even argue that the Government's exclusion of respondents from the CFC served any compelling governmental interest; she argues merely that the exclusion was "reasonable." The Court also implicitly concedes that the justifications petitioner offers would not meet anything more than the minimal "reasonable basis" scrutiny. *Ante*, at 808–809. I agree that petitioner's justifications for excluding respondents neither reserve the CFC for expressive activity compatible with the property nor serve any other compelling governmental interest.

The Court would point to three "justifications" for the exclusion of respondents. First, the Court states that "the President could reasonably conclude that a dollar directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on litigation that might or might not result in aid to the needy." *Ante*, at 809. I fail to see how the President's view of the relative benefits obtained by various charitable activities translates into a compelling governmental interest. The Government may have a compelling interest in increasing charitable contributions because charities provide services that the Government otherwise would have to provide. But that interest does not justify the exclusion of respondents, for respondents work to enforce the rights of minorities, women, and others through litigation, a task that various Government agencies otherwise might be called upon to undertake.

In any event, the fact that the President or his advisers may believe the money is best "directly spent on providing food or shelter to the needy" starkly fails to explain why respondents are excluded from the CFC while other groups that do not spend money to provide food or shelter directly to the needy are allowed to be included.[4]   Of the 237 groups included in the 1981–1982 CFC for the National Capital Area, only 61, or 26%, provide food, shelter, residential care, or information and referral services related to food or housing, according to the descriptions contained in the Contributor's Leaflet.   Indeed, in the past few years, the CFC for the National Capital Area has included many groups that have absolutely nothing to do with the provision of food or shelter or other basic needs.[5]

---

[4] Nor does petitioner's argument that money is best spent on providing food and shelter directly to those in need explain why groups that provide legal aid services that are not limited to a particular "kind of cause, claim, or defense," see 5 CFR § 950.101(a)(1)(i)(H) (1984), are admitted while respondents are not, or why groups that provide assistance related to custody disputes and related legal problems, see 1981 Contributor's Leaflet (description of International Social Service, American Branch), are admitted while respondents are not.

[5] During the 1981–1982 Campaign year, groups allowed to participate in the CFC for the National Capital Area included Close-up, "An alternative means of political education structured to teach high school students about government while providing opportunities for involvement to aid in deciding political futures"; The Rep, Incorporated, which "Provides a forum for training and educating writers, actors, theatrical directors and other theatre craftsmen"; African Heritage Dancers and Drummers, "A community arts organization designed to give students and area residents a greater appreciation of traditional African arts, dance and music"; D. C. Striders, "An organization of promising high school athletes which provides structured programs for field and track competitors"; the District of Columbia Music Center, which "Provides the opportunity for understanding and appreciation of the Fine Arts through study and performance"; and the Howard Theatre Foundation, which "Preserves the cultural legacy of the Howard Theatre."   Those groups may well provide most worthwhile services, but their inclusion in the CFC is difficult to square with the Government's purported conclusion that charitable contributions are best spent

The Court next states that "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." *Ante*, at 809. The Court, however, flatly has rejected that justification in the context of limited public forums. *Widmar* v. *Vincent*, 454 U. S., at 274. In addition, petitioner's proffered justification again fails to explain why respondents are excluded when other groups, such as the National Right to Life Educational Trust Fund and Planned Parenthood, at least one of which the Government presumably would wish to avoid the appearance of supporting, are allowed to participate. And petitioner offers no explanation why a simple disclaimer in the brochure would not suffice to achieve the Government's interest in avoiding the appearance of support.

Nor is the Government's "interest in avoiding controversy" a compelling state interest that would justify the exclusion of respondents. The managers of the theater in *Southeastern Promotions* no doubt thought the exclusion of the rock musical Hair was necessary to avoid controversy, see 420 U. S., at 563–564 (Douglas, J., dissenting in part and concurring in result in part); and the school officials in *Tinker* thought their exclusion of students protesting the activities of the United States in Vietnam was necessary to avoid controversy, see 393 U. S., at 509–510. Yet in those cases, both of which involved limited public forums, the Court did not accept the mere avoidance of controversy as a compelling governmental interest. Rather, the Court in *Tinker* held that in order to justify the exclusion of particular expressive activity, the government "must be able to show that its action was caused by something more than a mere desire to avoid the discom-

---

providing food or shelter to the needy. Petitioner would explain all these inconsistencies by saying that at times the Government may have misapplied its own eligibility criteria. Brief for Petitioner 49. If the Government is truly concerned that money be spent directly on food and shelter for the needy, it is strange that it could have misapplied its criteria almost 75% of the time.

fort and unpleasantness that always accompany an unpopular viewpoint." 393 U. S., at 509. The government instead must show that the excluded speech would "'materially and substantially interfere'" with the other activities for which the public property was intended. *Ibid.*, quoting *Burnside* v. *Byars*, 363 F. 2d 744, 749 (CA5 1966); see also *Cox* v. *Louisiana*, 379 U. S. 536, 551 (1965); *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949).

No such showing has been made here. As the Court of Appeals noted, the record completely fails to support any assertion that the "controversy" threatened to interfere with the purposes of the federal workplace. The Court admits that the avoidance of controversy in the forum itself is not a valid ground for restricting speech in a public forum, *ante*, at 811, and the same rule governs limited public forums. The fact that the CFC is limited to a particular class of speakers does not mean that it is not dedicated to "the free exchange of ideas." *Ibid.* A central purpose of the CFC obviously is to give federal employees the opportunity to choose among the charities that meet legitimate eligibility criteria, and the free exchange of ideas about which of those causes one should support is not to be infringed merely because a vocal minority does not wish to devote their charitable dollars to a particular charity.

Further, even if the avoidance of controversy in the forum itself could ever serve as a legitimate governmental purpose, the record here does not support a finding that the inclusion of respondents in the CFC threatened a material and substantial disruption. In fact, the evidence shows that contributions to the CFC increased during each of the years respondents participated in the Campaign. See Brief for Respondents 34 and sources cited therein. The "hundreds" of phone calls and letters expressing a preference that groups other than "traditional" charities be excluded from the CFC reflect nothing more than the discomfort that can be expected whenever a change is made, and whenever any opin-

ion is expressed on a topic of concern to the huge force in 1983 of some 2.7 million civilian federal employees.[6]   The letters objecting to the inclusion of respondents in the Campaign must be considered against the fact that many federal employees obviously supported their inclusion in the CFC, as is evidenced by the substantial contributions respondents received through the Campaign.

It is true that unions organized boycotts of the CFC in some areas because of their opposition to the participation in the CFC of the National Right to Work Legal Defense and Education Fund, and that, in those areas, contributions sometimes declined.   But the evidence also showed that after some initial confusion regarding whether the organization the unions found objectionable was receiving undesignated contributions, the major unions urged their members simply to designate their contributions so that none went to that group.   Further, apparently recognizing that its exclusion of all respondents merely because they share one characteristic with the organization that generated controversy is hardly a narrowly tailored exclusion, petitioner steadfastly maintains that the Government does not claim a right to exclude individual groups in "response to objections from federal employees"; petitioner claims instead that the Government has a right to "differentiate among broad categories of organizations, based on various reasons, including the belief that inclusion of organizations in one category is more likely to engender controversy among federal employees and to jeopardize the success of the Campaign because of the nature of the activities of those organizations."   Reply Brief for Petitioner 14, n. 11.   *Tinker* made clear that the exclusion of expressive activity must be based on more than such "undifferentiated fear or apprehension of disturbance."   393 U. S., at 508.

---

[6] Bureau of the Census, Statistical Abstract of the United States 322 (1985).

### III

Even if I were to agree with the Court's determination that the CFC is a nonpublic forum, or even if I thought that the Government's exclusion of respondents from the CFC was necessary and narrowly tailored to serve a compelling governmental interest, I still would disagree with the Court's disposition, because I think the eligibility criteria, which exclude charities that "seek to influence . . . the determination of public policy," Executive Order No. 12404, 3 CFR 152 (1984), is on its face viewpoint based. Petitioner contends that the criteria are viewpoint neutral because they apply equally to all "advocacy" groups regardless of their "political or philosophical leanings." Brief for Petitioner 30. The relevant comparison, however, is not between the individual organizations that make up the group excluded, but between those organizations allowed access to the CFC and those denied such access.

By devoting its resources to a particular activity, a charity expresses a view about the manner in which charitable goals can best be achieved. Charities working toward the same broad goal, such as "improved health," may have a variety of views about the path to that goal. Some of the "health services" charities participating in the 1982 National Capital Area CFC, for example, obviously believe that they can best achieve "improved health care" through medical research; others obviously believe that their resources are better spent on public education; others focus their energies on detection programs; and still others believe the goal is best achieved through direct care for the sick. Those of the respondents concerned with the goal of improved health, on the other hand, obviously think that the best way to achieve that goal is by changing social policy, creating new rights for various groups in society, or enforcing existing rights through litigation, lobbying, and political activism. That view cannot be communicated through the CFC, according to the Govern-

ment's eligibility criteria. Instead, Government employees may hear only from those charities that think that charitable goals can best be achieved within the confines of existing social policy and the status quo. The distinction is blatantly viewpoint based, so I see no reason to remand for a determination of whether the eligibility criteria are a "facade" for viewpoint-based discrimination.

I would affirm the judgment of the Court of Appeals.

JUSTICE STEVENS, dissenting.

The scholarly debate between JUSTICE O'CONNOR and JUSTICE BLACKMUN concerning the categories of public and quasi-public fora is an appropriate sequel to many of the First Amendment cases decided during the past decade.[1] As is true of the Court's multitiered analysis of equal protection cases, however, I am somewhat skeptical about the value of this analytical approach in the actual decisional process. See *Cleburne* v. *Cleburne Living Center, ante,* at 451–454 (STEVENS, J., concurring). At least in this case, I do not find the precise characterization of the forum particularly helpful in reaching a decision.

Everyone on the Court agrees that the exclusion of "advocacy" groups from the Combined Federal Campaign (CFC) is prohibited by the First Amendment if it is motivated by a bias against the views of the excluded groups. Moreover, everyone also recognizes that the evidence in the record

---

[1] As two commentators noted:

"Public forum analysis appears to be increasing in importance. The doctrine traces back to a famous dictum of Justice Roberts and received further attention from Professor Kalven almost twenty years ago, but it was almost never used in Supreme Court opinions until recently. The phrase 'public forum' has appeared in only thirty-two Supreme Court decisions. Only two of these decisions were rendered prior to 1970 and thirteen of the thirty-two have been in the 1980's." Farber & Nowak, The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication, 70 Va. L. Rev. 1219, 1221–1222 (1984) (footnotes omitted).

gives rise to at least an inference that "the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers." *Ante,* at 812; see also *ante,* at 832 (BLACKMUN, J., dissenting).[2] The problem presented by the case is whether that inference is strong enough to support the entry of a summary judgment in favor of respondents.

Today the Court decides to remand the case for a trial to determine whether the exclusion of respondents was the product of viewpoint discrimination. *Ante,* at 797, 812–813. That decision is supported by the rule that forecloses the entry of a summary judgment when a genuine issue of fact is present, and by the special limitations on this Court's ability to undertake its own review of trial records. Cf. *United States* v. *Hasting,* 461 U. S. 499, 516–519 (1983) (STEVENS, J., concurring in judgment). Nevertheless, my study of the case has persuaded me that the Court of Appeals correctly affirmed the entry of summary judgment in favor of respondents.

---

[2] It is worth noting that the Government has advanced a series of different arguments for the result that it has sought during the course of this controversy. See *NAACP Legal Defense & Educational Fund* v. *Devine,* 234 U. S. App. D. C. 148, 152, 727 F. 2d 1247, 1251 (1984) (that the legal defense funds did not provide "direct services"); *id.,* at 153, 727 F. 2d, at 1252 (that the legal defense funds sought to influence public policy by litigating on behalf of persons other than themselves); *id.,* at 154, 727 F. 2d, at 1253 (employee objections and boycotts); *ibid.* (placing the fundraising objective in jeopardy); *ibid.* (the improper use of taxpayer resources to raise funds for advocacy organizations and political education groups); *ibid.* (undue burden because of the large number of organizations in the CFC); *id.,* at 155, 727 F. 2d, at 1254 ("[T]he CFC does not involve solicitation by the participating charities, and is more accurately described as a 'subsidy' by the Federal Government"); *id.,* at 160, 727 F. 2d, at 1259 (that the CFC is limited to those organizations that assist the needy); *id.,* at 161, 727 F. 2d, at 1260 (that the Government should not appear to favor "political advocacy groups"); *id.,* at 162, 727 F. 2d, at 1261 (that inclusion would be "controversial"); *id.,* at 166, 727 F. 2d, at 1265 (that alternative fora are available).

As the District Court found, "the CFC provides employees with two ways in which to make contributions . . . . An employee may designate that his donations be distributed to particular organizations participating in the CFC. Alternatively, if the employee does not designate any agency to benefit from the donation, the amount contributed is placed into a pool which is divided among the approved agencies in accordance with a formula set forth in the regulations." *NAACP Legal Defense & Educational Fund, Inc.* v. *Devine,* 567 F. Supp. 401, 406 (DC 1983).

This case does not involve the general pool that is supported by *undesignated* contributions. Brief for Petitioner 11; Brief for Respondents 6. Respondents do not participate in that pool and do not receive, or seek to receive, any share of the federal employees' undesignated contributions. Instead, respondents receive only those CFC contributions that are specifically designated to go to them. To phrase it in another manner, respondents only benefit from contributions that are the result of the free and voluntary choices of federal employees who make specific designations. Those federal employees who merely support the undesignated CFC fund, as well as those who designate other charities, provide no support for respondents.

I emphasize this fact because the arguments advanced in support of the exclusion might well be sufficient to justify an exclusion from the general fund, but have manifestly less force as applied to designated contributions. Indeed, largely for the reasons that JUSTICE BLACKMUN has set forth in Parts II–B and III of his opinion, the arguments advanced in support of the exclusion are so plainly without merit that they actually lend support to an inference of bias.[3]

---

[3] In expressing this opinion, I do not intend to suggest that the author of the regulation was motivated by a conscious prejudice against advocacy groups. A subconscious bias, based on nothing more than a habitual attitude of disfavor, or perhaps a willingness to assume that frequent

I am persuaded that each of the three reasons advanced in support of denying advocacy groups a right to participate in a request for *designated* contributions is wholly without merit. The Government's desire to have its workers contribute to charities that directly provide food and shelter rather than to those that do not surely cannot justify an exclusion of some but not other charities that do not do so. Moreover, any suggestion that the Government might be perceived as favoring every participant in the solicitation is belied by the diversity of the participants and by the fact that there has been no need to disclaim what must be perfectly obvious to the presumptively intelligent federal worker. Last, the supposed fear of controversy in the workplace is pure nonsense—one might as well prohibit discussions of politics, recent judicial decisions, or sporting events.[4] In sum, the reasoning set forth in Parts II–B and III of JUSTICE BLACKMUN's dissenting opinion persuades me that the judgment should be affirmed.

---

expressions of disagreement with the achievements of advocacy groups adequately demonstrate that they are somehow inferior to "traditional health and welfare charities," may provide the actual explanation for a regulation that is honestly, but incorrectly, believed to be "viewpoint neutral." "For a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification." *Mathews* v. *Lucas*, 427 U. S. 495, 520 (1976) (STEVENS, J., dissenting).

[4] Expressions of affection for the Dallas Cowboys would surely be forbidden in all federal offices located in the District of Columbia if the avoidance-of-controversy rationale were valid.