McMILLIAN, Circuit Judge.
This action was brought in the United States District Court for the District of Minnesota pursuant to 42 U.S.C. § 1983 by Albert Burnham and Ronald Márchese, two history professors at the University of Minnesota at Duluth (UMD), and Michael Kohn and Louise Kohn (the Kohns), two former UMD history students (collectively plaintiffs), against Lawrence Ianni, Chancellor of UMD, alleging that Ianni deprived them of rights protected by the free speech clause of the First Amendment.[1] Ianni appeals from the district court’s order denying his motion for summary judgment on the basis of qualified immunity. Burnham v. Ianni, 899 F.Supp. 395 (D.Minn.1995). For reversal, Ianni argues that the district court erred in holding that he violated plaintiffs’ clearly established constitutional rights by ordering the removal of two photographs, one of Burnham and the other of Márchese, from a display case located in a hallway outside the UMD history department’s classrooms. For the reasons discussed below, we reverse the order of the district court and remand the ease to the district court with directions to enter judgment for Ianni.
I. Background
The underlying facts of this case are generally not in dispute. Id. at 397. The two photographs of Burnham and Márchese, which are at the center of this dispute, were originally part of a visual exhibit conceived of and created by the Kohns while they were students at UMD. The Kohns were both members of the UMD history club, for which Burnham was the faculty advisor. The Kohns’ objective in displaying the exhibit was to convey to observers the history faculty’s diverse interests. In photographing the UMD history professors, the Kohns asked each to pose with a “prop” of his or her own choice, related to his or her areas of interest. The photographs were then juxtaposed with written descriptions of the subject’s academic background, historical heroes, and a chosen quotation. Burnham, who has a special interest in American military history, chose to be photographed wearing a coonskin cap and holding a .45 caliber pistol; Márchese, who specializes in ancient Greece and Rome, posed wearing a cardboard laurel wreath and holding a Roman short sword.
On May 5, 1992, an officer with the UMD campus police, acting under instructions from *1011 Ianni, removed the photographs of Burnham and Márchese from the display case.[2] Ianni ordered the removal of the two photographs because he considered them inappropriate for display in light of events that had occurred over the previous year.
In June of 1991, approximately one year before the photographs of Burnham and Márchese were removed from the display case, Sandra Featherman was appointed to the post of UMD vice chancellor. Shortly thereafter, she began receiving graphically violent threats from an anonymous source or sources using the identities “Deer Hunters” and “Prince of Death,” and warning her that if she did not stay away from Duluth, she would be kidnapped or killed. At the same time, a phony memorandum, bearing a forged signature purporting to be Ianni’s, was circulated through the UMD mail system and distributed on and around campus. This fraudulent memorandum referred to the “conspiracy to kidnap Sandra Featherman going on at UMD.” Appellant’s Appendix at 17 (forged memorandum).
Beginning in March 1992, UMD history professor Judith Trolander became the target of threats similar to those directed at Featherman. Both Featherman and Trolan-der had been involved in a program to improve diversity and equality on the UMD campus. A flyer entitled “Target Information” was anonymously posted around campus which said, among other things, “The Imperial Council of Deer Hunters Proclaim Open Season on Judy Trolander Lesbian Feminist Bitch.” This document told the reader where to find Professor Trolander’s picture and where she lived, and stated the following:
She will be a good target for shooting at long range. The house has large windows and the terrain is clear of obstacles in all directions. Shooting from the beach or even from a boat in the bay or lake Superi- or is feasible. A 30-60 rifle with 20X2 Bushnell scope would be a suitable weapon with dum-dum bullets dipped in poison. Don’t forget to put in a couple of clicks in the crosshairs for windage as the wind is usually strong there. It is recommended that the hunter shoot from behind the Surf and Sand Health Center, if there is return fire from the house it well only kill a few old people. She is the only occupant of the house, so it is OK to shoot silhouettes on drawn shades.
Get cracking you kill crazy buckaroos. Its OK to kill her, the Imperial Counsel rules UMD, the commission on women is dissolved.
Also, all faculty members ordered to participate in Featherman’s administrative development project will be sentenced to death along with their pets, children, and spouses if they comply with these orders. Any one who cooperates with Featherman will have their target information published.
The deer hunters need target information on Featherman, just mention where she lives in the faculty club and everything will be taken care of.
Appellant’s Appendix at 38.
In an attempt to respond to the tension and widespread fear of violence created by these terroristic threats, Ianni distributed on campus a memorandum dated March 16, 1992, assuring that the matter was being investigated by local and federal authorities, that every effort would be made to bring the perpetrators to justice, and that the school remained committed to improving the conditions of women and minorities on campus.
On or about March 27, 1992, less than a month after the so-called “Target Information” flyer was posted, the photographs of Burnham and Márchese were placed in the display ease along with the other photographs and written materials contained in the Kohns’ exhibit. Judith Karon, UMD’s director of personnel and affirmative action officer, began receiving complaints and anonymous calls objecting to the depictions of the two faculty members holding weapons, particularly the picture of Burnham holding a gun. Professor Trolander, who was extremely upset about the photographs, also contacted Karon. Karon made efforts to have the photographs removed, expressing her belief that they were inappropriate in *1012 light of the recent events and the atmosphere of tension and fear on campus. Several meetings involving Karon, Ianni, the Kohns, Burnham, Márchese, and other faculty members in the history department, were held to discuss the two photographs. The chairman and other members of the history department steadfastly opposed their removal. See Appellant’s Appendix at 50 (internal history department memorandum: “[slomehow, this ugly trend of History governance by external administrators and bureaucrats must be called into account; if the photo display is our line in the sand, so be it”). On May 4, 1992, Ianni ordered the two photographs removed from the display case.
Plaintiffs filed this § 1983 action alleging that the removal of the photographs violated their First Amendment right of free speech. Ianni filed several motions, including a motion for summary judgment on qualified immunity grounds. The district court denied that motion, explaining:
On the facts of this case, the court finds, without hesitation, that “[t]he contours of the right [were] sufficiently clear [so] that a reasonable official would understand that what he [did] violates that right.” Ianni asserts that his actions were taken with the intent to “maintain a positive and efficient working and learning environment conducive to the mission of an academic institution.” ... Chancellor Ianni is, presumably, an educated and erudite person. It is inconceivable to this court that the Chancellor of a major University could have failed to know that [the] First Amendment forbade, except in the narrowest of circumstances, the type of conduct at issue here.
Burnham v. Ianni, 899 F.Supp. at 400-01 (citations omitted). Having held that plaintiffs’ clearly established First Amendment rights had been violated, the district court also denied Ianni’s motion to dismiss. Id. at 404. In reaching its conclusion on the merits, the district court noted that the display case was a nonpublic forum. Id. at 403. Therefore, the district court held, the suppression of speech at issue in the case was subject to a reasonableness test. Id. (citing Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983) (Perry)). The district court then determined that the photographs were removed because they were offensive to some viewers and, therefore, the suppression was content-based and not reasonable. Id. at 403-04. The district court stated:
Whether the photographs advocated anything is irrelevant in this context; on the contrary, it was the perception that the photographs somehow advocated support for those [who] had made the threats which motivated their removal. This is an impermissible content based restric-tion_ That some members of the faculty and administration were discomfited by the sight of the photographs displaying weapons is insufficient to justify the removal of the photographs.
Id. at 404. This appeal followed.
II. Discussion

A. Appellate Review

As stated above, the underlying essential facts are not in dispute. Under these circumstances, we have appellate jurisdiction to review the district court’s order denying Ianni’s motion for summary judgment on qualified immunity grounds insofar as the district court held, as a matter of law, that Ianni violated plaintiffs’ clearly established First Amendment rights. See Johnson v. Jones, — U.S. —, —, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (citing Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985) (interlocutory appellate jurisdiction exists where qualified immunity issue involves application of “clearly established” law to a given set of undisputed facts)).
“While the denial of a motion for summary judgment is not normally an appealable final judgment, an exception exists for a summary judgment order denying qualified immunity ... [and for] issues of law that are closely related to the qualified immunity determination.’ ” Beyerbach v. Sears, 49 F.3d 1324, 1325 (8th Cir.1995) (quoting Henderson v. Baird, 29 F.3d 464, 467 (8th Cir.1994), cert. denied, — U.S. —, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995)). *1013 We review the district court's denial of Ian-ni's motion for summary judgment de novo. Id. (citing Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir.1992)). Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Id.; Fed.R.Civ.P. 56(c).
B. Nature of plaintiffs' claim
In the present case, plaintiffs maintain that the two photographs of Burnham and Marchese constitute protected speech because they capture and convey an informational message concerning the UMD history department. Brief for Appellees at 4 ("[tlhe exhibit was intended to inform students and prospective students about the interests and areas of expertise of the professors in the department"), 34 (the photographs "expressed and advocated the professors' interests in the traditional study of classical and American military history"). Plaintiffs describe the message purportedly conveyed by the two photographs as follows.
For his photograph, Professor Marchese elected to pose with an ancient Roman short sword while wearing a cardboard laurel wreath.... He chose to pose with the Roman sword for two reasons. First, he likes to use tangible objects in his lectures, and he had previously used the sword in that way. Second, one of his interests is military history. He believes that a thorough knowledge of the ancient world must include an appreciation for the military culture and techniques that allowed Rome to gain and hold an ascendancy over the Mediterranean world. His courses on ancient history include far more than military history, but he thinks that military history is an important aspect of that era. Hence he believed the Roman sword was an appropriate "prop" for his photograph.
Professor Burnham's special interest in American history includes military history in particular. Among his historical heroes he listed were John Adams and David Crockett. Consistent with his professional interests, he posed with a .45 caliber military pistol, wearing a coonskin cap.
Id. at 3.
C. Burnham's and Marchese's First Amendment rights
Although plaintiffs have failed to articulate this analytical premise, the two professors' claims derive from the assertion that they were engaging in non-verbal expressive conduct by their choices of clothing and props, as worn and displayed in each of their respective photographs.[3] Accordingly, in determining whether lanni violated Burnham's and Marchese's rights in suppressing the two photographs, our analysis is guided by this court's recent decision in Tindle v. Caudel4 56 F.3d 966 (8th Cir.1995) (Tindle), addressing the standards that apply to this precise type of First Amendment claim.
In Tindle, a police officer with the Little Rock Police Department (LRPD) brought a § 1983 action against the chief of police on grounds that his First Amendment rights were violated when he was given a thirty-day suspension for appearing at a Halloween party wearing a blackened face, dressed in bib overalls and a black curly wig, and carrying a watermelon.[4] In acknowledging that the plaintiff had facially asserted a First Amendment right, this court stated:
What one chooses to wear can communicate an expressive message to others.... Wearing a particular outfit or costume is non-verbal conduct that is protected as *1014 speech under the first amendment if it is intended to convey a "particularized message" and if the likelihood is great that the message will be understood by those who view it.
Id. at 969; accord Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 505-06, 89 S.Ct. 733, 735-36, 21 L.Ed.2d 731 (1969) (wearing black armband to express students' opposition to Vietnam War was symbolic act protected by the free speech clause of the First Amendment); Dunn v. Carroll, 40 F.3d 287, 291-92 (8th Cir.1994) (Dunn) (wearing patch bearing American flag during months preceding the Persian Gulf War was nonverbal conduct protected under the free speech clause). However, this court then went on to explain in Tindle that, even if a person's chosen appearance is found to be expressive non-verbal conduct or speech, it is not entitled to absolute protection. 56 F.3d at 970. Because the plaintiff in Tindle was a public employee, and the state was acting in its capacity as his employer in suspending him on the basis of his speech, his First Amendment claim was to be analyzed according to the following "two-step test":
The first question is whether the employee's speech addresses a matter of public concern. Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689-90, 75 L.Ed.2d 708 (1983) [(Connick)]. If it does, then the court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968) [(Pickering)].
Tindle, 56 F.3d at 970; accord Waters v. Churchill, 511 U.S. 661,-, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994) (Waters). It is the job of the court to apply this analysis to the facts. Waters, 511 U.S. at -, 114 S.Ct. at 1884 (citing Connick, 461 U.S. at 148 7 & 150 n. 10, 103 S.Ct. at 1690 n. 7 & 1692 n. 10).
In the present case, we will assume, for the sake of argument, that Burnham and Marchese have adequately demonstrated that they sought to convey a "particularized message" through the clothing worn and props held in each of their respective photographs. That message, as they describe it, was to "express[] and advocate[] [their] interests in the traditional study of classical and American military history." Brief for Appellees at 34. We will further assume, for the sake of argument, that the likelihood was great that this "particularized message" would be understood by those who viewed the photographs.
It is undisputed that Burnham and Marchese are public employees and that Ian-ni was acting in his official capacity as a public employer representing the interests of UMD when he ordered the removal of the photographs from the display case located in the corridor near the UMD history department's classrooms. Therefore, consistent with Tindle, the suppression of the two photographs must be analyzed according to the two-part analysis required by the Pickering-Connick-Waters line of Supreme Court cases dealing with the First Amendment rights of public employees.[5] As the Supreme Court observed in Waters, "the government as employer indeed has far broader powers than does the government as sovereign." 511 U.S. at -, 114 S.Ct. at 1886. Accordingly, the courts "have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify *1015 restrictions on the speech of the public at large." Id. at -, 114 S.Ct. at 1887; accord Tindle, 56 F.3d at 972 (same).
Consistent with Pickering and its progeny, we first consider the issue of whether Burnham's and Marchese's expressive conduct, as captured in the two photographs, addressed a matter of public concern. In addressing the meaning of speech on a matter of "public concern," the Supreme Court has explained: "[wlhen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Con-nick~ 461 U.S. at 146, 103 S.Ct. at 1690. Assuming that Burnham's and Marchese's conduct "expressed and advocated the professors' interests in the traditional study of classical and American military history" and "inform[ed] students and prospective students about the interests and areas of expertise of the professors in the department," Brief for Appellees at 34, 4, it arguably did address a matter of public concern. We will assume for the sake of argument that it did. Thus, we next proceed to balance the interests of Burnham and Marchese in commenting upon or expressing their particular areas of academic interest, through "humorous" and "light-hearted" portrayals of themselves, against the interests of UMD, as their employer, in avoiding the potential disruption that lanni predicted would result from the continued display of the photographs. According to lanni, his intent in removing the two photographs "was to maintain a positive and efficient working and learning environment conducive to the mission of an academic institution." Appellant's Appendix at 8 (Affidavit of Lawrence lanni, ¶ 11). He explained in his affidavit:
The March 1992 threat against Professor Trolander inflamed an already tense environment. I saw numerous employees in tears during that time period, which they reported to me was due to concern over the death threats and fears that someone would randomly open fire on the campus.... The atmosphere was unique in my experience.
Id. at 7 (Affidavit of Lawrence lanni, ¶ 8). According to his affidavit, he also felt that a failure to remove the photographs would have a detrimental effect on faculty collegiality. IcL at 7 (Affidavit of Lawrence lanni, ¶ 9).
Plaintiffs maintain that lanni's prediction of potential disruption on campus and detriment to faculty collegiality was II-logical. However, they do not allege, nor does anything in the record suggest, that lanni had any motive in removing the photographs other than those which he described in his affidavit. Moreover, in considering the weight to be given lanni's prediction of disruption, we note that it is now well-established that the anticipated disruption in this context need not be actual, but may be merely potential. Waters, 511 U.S. at -` 114 S.Ct. at 1890 ("the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had"); Tindle, 56 F.3d at 972 ("[a] showing of actual disruption is not always required in the balancing process under Pickering "); accord Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.) (Jeffries) (noting that Waters stresses that actual disruption is not required), cert. denied, - U.S. , 116 S.Ct. 173, 133 L.Ed.2d 114 (1995). We also recognize that, in balancing the interests of a public employee against the interests of the government employer in this context, the constitutional standard takes into account proportionality. "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished.... There is, thus, a proportion between the nature of the speech and the nature of the sanction that may ensue." Jeffries, 52 F.3d at 13 (citation omitted). In the present case, lanni need only have made a minimal showing of potential disruptiveness to justify his actions because Burnham's and Marchese's speech at best only remotely touched upon a matter of public concern (i.e., "the professors' interests in the traditional study of classical and American military history," Brief for Appel-lees at 34). Cf. Dunn, 40 F.3d at 292 (mes *1016 sage intended to be conveyed by wearing a patch bearing the American flag during the United States' military buildup in the Persian Gulf was "squarely within `the center of lic debate' "). In the present case, it is disputed that violent death threats had been widely publicized on campus less than two months before the photographs were moved from the display case. It cannot ously be disputed that, during that spring 1992 semester, the atmosphere on campus was more tense than normal. Upon de novo review, we have little difficulty holding as a matter of law that the balance of interests tips in favor of lanni in this particular stance. As the Supreme Court has clearly stated: The key to First Amendment
analysis of government employment decisions ... is this: The government's interest hi ing its goals as effectively and efficiently as possible is elevated from a relatively ordinate interest when it acts as sovereign to a significant one when it acts as er. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the ment is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate. Waters, 511 U.S. at , 114 S.Ct. at 1888
(emphasis added); accord at - 114 S.Ct. at 1888 (emphasis added); accord Jeff ries 52 F.3d at 10 (on remand from the Supreme Court for reconsideration in light of Waters holding that defendants university officials were en titled to judgment as a matter of law on professor's claim that they violated his First Amendment rights by reducing his term as department chair because of derogatory com ments he made about Jews in an off-campus speech). In Jeffries 52 F.3d at 13 the Sec ond Circuit explained:
Whittled to its core Waters permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disrup tion is reasonable; (2) the potential disrup tiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech.~[6]1
Accordingly we hold as a matter of law that lanni in ordering the removal of the two photographs from the display case did not violate Burnham's and Marchese's First Amendment rights to the extent that they were engaging in non-verbal expressive con duct by bearing weapons in their photo graphs.[7]
D. Qualified Immunity
We further hold that even if we were to find that lanni violated Burnham's and Marchese's First Amendment rights lanni may not be held personally liable to pay damages because under the specific cir cumstances of the present case he is protect ed by qualified immunity.
[P]ermitting damages suits against govern ment officials can entail substantial social costs including the risk that fear of per sonal monetary liability and harassing liti gation will unduly inhibit officials in the discharge of their duties. [Harlow v. Fitzgerald 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).] Our cases have accommodated these conflicting con cerns by generally providing government officials performing discretionary functions with a qualified immunity shielding them from civil damages liabifity as long as their actions could reasonably have been thought consistent with the rights they are *1017 alleged to have violated. See, e.g., Malley Briggs, 475 U.S. 335, 341 [106 S.Ct. 1092, 1096, 89 L.Ed.2d 271] (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); Mitchell v. Forsyth 472 U.S. 511, 528 [105 S.Ct. 2806, 2816, 86 L.Ed.2d 411] (1985) (officials are immune unless "the law clearly proscribed the actions" they took); Davis v. Scherer, 468 U.S. 183, 191 [104 S.Ct. 3012, 3017-18, 82 L.Ed.2d 139] (1984); Harlow v. Fitzgerald supra, at 819 [102 S.Ct. at 2738-39]. Cf. e.g., Procunier v. Navarette, 434 U.S. 555, 562 [98 S.Ct. 855, 859-60, 55 L.Ed.2d 24] (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, Harlow Iv. Fitzgerald], 457 U.S. at 819 [102 S.Ct. at 2738-39], assessed in light of the legal rules that were "clearly established" at the time it was taken, id. at 818 [102 S.Ct. at 2738].
Anderson v. Creighton, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).
In Anderson v. Creighton, the Supreme Court addressed the degree of generality versus specificity with which the relevant legal rule is to be defined for purposes of determining whether the law was "clearly established" at the time of the relevant events. Id. at 639, 107 S.Ct. at 3038-39. The Court explained that, in order for the concept of a "clearly established" law to comport with the "objective legal reasonableness" standard set forth in Harlow v. Fits-gerald~, 457 U.S. at 819, 102 S.Ct. at 2738-39, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of preexisting law the unlawfulness must be apparent." Id. at 640, 107 S.Ct. at 3039 (citations omitted).
Needless to say, the very conduct at issue in the present case had not been specifically held unlawful at the time of the relevant events. The pertinent case law in existence at the time lanni removed the photographs from the display case included the Supreme Court's decisions in Connick and Pickering, as well as a body of lower federal court decisions which had applied Connick and Pickering-none of which were factually similar to the present case. With this in mind, we now ask the question: assuming that lanni had violated Burnham's and March-ese's First Amendment rights, would that violation have been objectively reasonable, in light of the legal rules that were "clearly established" at the time of his actions? Stated differently, would the assumed unlawfulness have been apparent in light of preexisting law? See Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039.
As discussed above, the Pickering balancing test involves a two-part inquiry: (1) whether the speech is on a matter of public concern, Connick, 461 U.S. at 146, 103 S.Ct. at 1689-90, and, if so, (2) whether, on balance, the interests of the employee in making the statement outweigh the interests of the government employer in promoting the efficiency and effectiveness of the public services it performs. Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. If both criteria have been met, then a First Amendment violation has occurred. In the present case, if we were to find that a First Amendment violation occurred, we would conclude that it was not based upon clearly established law. First, it would not have been clear to an objectively reasonable official that the photographs contained speech on a matter of public concern, even assuming they "expressed and advocated the professors' interests in the traditional study of classical and American military history." Brief for Appellees at 34. As stated above, we think these photographs, which were intended to be informal and humorous visual displays of each professor's individual academic interests, at best only remotely touched upon a matter of public concern. See supra at 1015-16.
Moreover, at the time lanni removed the photographs, it would not have been appar- *1018 ent to an objectively reasonable official that Burnham’s and Marchese’s interests in displaying themselves holding weapons, as a way of demonstrating their individual academic specialties, outweighed UMD’s interest in removing the photographs, in an effort to maintain an efficient and effective campus environment. As discussed above, there were numerous competing factors which contributed to Ianni’s decision to remove the photographs at that particular time, including the atmosphere of tension and fear on campus resulting from the recent highly publicized death threats and the fact that alternative channels were left open for plaintiffs to convey the same information. See supra at 1019-20.
We believe our qualified immunity analysis is consistent with the current state of qualified immunity jurisprudence as it has evolved in this and other circuits. In Grantham v. Trickey, 21 F.3d 289, 292-95 (8th Cir.1994) (Grantham), this court thoroughly examined the history of Eighth Circuit case law dealing specifically with the applicability of qualified immunity in the public employee speech context. Implicit in that opinion is the fundamental tenet that the qualified immunity analysis should always be adapted to the specific case at hand. Id. at 293-95. In Grantham, 21 F.3d at 295, this court determined that it was appropriate under the circumstances of that case to follow the analysis in Bartlett v. Fisher, 972 F.2d 911 (8th Cir.1992) (Bartlett). In Bartlett, 972 F.2d at 916-17, we recognized that, “because Pickering’s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered ‘clearly established’ for purposes of the Harlow qualified immunity standard.”[8] We agree with this statement as a general proposition, and think that the present ease is not an exception. Qualified immunity is ordinarily a formidable defense to overcome where the constitutionality of official conduct is being assessed according to a fact-intensive balancing test.[9]
In sum, we conclude that, even if we were to find that Ianni violated Burnham’s and Marehese’s First Amendment rights, “officers of reasonable competence could disagree on this issue” and, therefore, “immunity should be recognized.” Malley v. Briggs, 475 U.S. at 341, 106 S.Ct. at 1096. Accordingly, as an alternative basis for our disposition, we hold that Ianni would, in any case, be protected by qualified immunity.

*1019
E. The Kohns’ First Amendment Rights

While Burnham and Márchese were responsible for the expressive conduct that was captured in each of their respective photographs, it was the Kohns who conceived of the idea for the exhibit and who were responsible for placing the photographs in the display case. Therefore, the Kohns have asserted a First Amendment right to use the two photographs as a means “to publicize some of the areas of expertise and interest of the History Department’s faculty, while at the same time portraying the faculty in an informal, somewhat humorous way.” Brief for Appellees at 2.[10] Their claims require a separate analysis.
To begin, we agree with the district court’s conclusion that the display case was a nonpublie forum. Burnham v. Ianni, 899 F.Supp. at 403 (focusing on facts that the display case was under UMD’s control, that UMD allowed members of the history club to use it upon request, and that the display case was dedicated to use of the UMD history department for disseminating information about the department). Because the display case was a nonpublic forum, the issue as to whether the Kohns’ First Amendment rights were violated when the two photographs were removed from the display case turns on whether “the distinctions drawn [were] reasonable in light of the purpose served by the forum and [were] viewpoint neutral.” Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985) (Cornelius). So long as these requirements are met, “Control over access to a nonpublic forum can be based on subject matter.” Id. “The reasonableness of the Government’s restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances.” Id. at 809, 105 S.Ct. at 3453.
We hold that Ianni’s decision to remove from the display case the two photographs which depicted professors holding weapons was not an unreasonable subject matter restriction in light of the purpose of the forum, which was to disseminate information about the history department and, additionally, according to plaintiffs, to display items of historical interest. Brief for Appellees at 4-5. His actions were narrowly tailored • and left open other channels through which the Kohns could still publicize Burnham’s and Marchese’s interests in classical and American military history. See Perry, 460 U.S. at 53, 103 S.Ct. at 969 (“the reasonableness of the limitations ... is also supported by the substantial alternative channels that remain open”). For example, nothing prevented the Kohns from replacing the removed photographs with similar pictures of Burnham and Márchese without weapons, while continuing to publicize through written descriptions their interests in American military and classical history. Moreover, Ianni’s actions were reasonable in light of the events of the preceding year, during which two UMD employees, including one professor in the history department, had been the targets of violent threats and efforts to intimidate them by encouraging others to commit acts of violence against them. While plaintiffs emphasize that “neither plaintiffs nor their pictures had anything whatsoever to do with [the threats against Featherman and Trolander],” Brief for Ap-pellees at 17, the law does not require Ianni to prove such a correlation. “[A] finding of strict incompatibility between the nature of the speech ... and the functioning of the nonpublic forum is not mandated.” Cornelius, 473 U.S. at 808, 105 S.Ct. at 3452.
Finally, notwithstanding our failure to discern any viewpoint from the exhibition of photographs which purportedly projected the interests of Burnham and Márchese in American military and classical history, Ianni has demonstrated beyond any dispute that his removal of the photographs had nothing whatsoever to do with those matters. As discussed above, he was motivated solely by the potential disruptiveness of the photographs. On this point, we note the district court’s emphasis on its conclusion that the suppression was “content-based.” Burnham *1020 v. Ianni, 899 F.Supp. at 403-04. However, the current constitutional standard in nonpublic forum cases does not focus solely on whether the suppression was content-based but, rather, turns on whether the suppression was reasonable and viewpoint-neutral.
In sum, we hold as a matter of law that Ianni did not violate the Kohns’ First Amendment rights when he had removed from the display case two photographs depicting what he reasonably considered to be potentially disruptive and, therefore, inappropriate subject matter. Furthermore, even if we were to conclude that Ianni violated the Kohns’ First Amendment rights, we would in any case hold that Ianni is shielded by qualified immunity from liability for damages because “officers of reasonable competence could disagree on this issue” and, therefore, “immunity should be recognized.” Malley v. Briggs, 475 U.S. at 341, 106 S.Ct. at 1096.
III. Conclusion
For the forgoing reasons, we hold as a matter of law that Ianni did not violate any of plaintiffs’ First Amendment rights. We further hold, in the alternative, that, even if Ianni did violate any of plaintiffs’ First Amendment rights, he is protected by qualified immunity. Accordingly, the order of the district court denying Ianni’s motion for summary judgment is reversed and the case is remanded to the district court with instructions to enter judgment for Ianni.

. In their amended complaint, plaintiffs sought a declaration that Ianni's actions were unconstitutional, injunctive relief against Ianni in his official capacity, and monetary relief against Ianni in his individual capacity in the amount of at least $50,000, plus interest. Appellant's Appendix at 4 (amended complaint).

. Burnham then removed the remaining photographs in the Kohns’ exhibit.

. While plaintiffs also maintain that the photographs were intended to portray the faculty in an "informal" and "somewhat humorous" manner, Brief for Appellees at 2, they do not argue, nor would we find, that the photographs were intended to be forms of entertainment. Accordingly, we need not consider the First Amendment standard applicable for some forms of entertainment. Cf. IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ., 993 F.2d 386, 390-91 (4th Cir.1993) (because college fraternity's "ugly woman contest" was similar in nature to a theatrical performance, it was an inherently expressive form of entertainment and entitled to constitutional protection despite offensive caricature of African-American woman).

. The party, which was held at the Fraternal Order of Police Lodge, was not an official police department function but was attended by off-duty police officers and their guests. Tindle v. Cau-dell, 56 F.3d 966, 968 (8th Cir.1995).

. Plaintiffs make much of the fact that the present case is different from the public employment cases cited by lanni in that it does not involve a personnel action such as a termination or a suspension of Burnham or Marchese from their employment. We find this distinction irrelevant. lanni removed the photographs in part because he considered them detrimental to the collegiality within the histoxy department. Appellant's Appendix at 7 (Affidavit of Lawrence lanni, ¶ 9). The fact that lanni chose to respond to what he considered to be inappropriate employee conduct by the narrowly tailored act of suppressing the photographs themselves makes this case no less employment-related than if he had terminated Burnham and Marchese as an indirect means to remove the photographs or if he had terminated or suspended them after the fact for refusing to remove the photographs voluntarily.

. On this point we emphasize that Tanni's ac tions were directly targeted at the source of the potential disruption and were not in retaliation for the speech.

. In support of our holding we also note the undisputed facts that following the 1992 sum mer break the photographs were posted in the student center on campus and no action was taken at that time because the atmosphere on campus had improved. Appellant's Appendix at 8 (Affidavit of Lawrence lanni � 12). These facts further support our conclusion that lanni as chancellor of UMD did not act unreasonably in handling this entire matter. Cf. Piarowski v. Illinois Com. College Dist. 515, 759 F.2d 625 632 (7th Cir.) ("ft]he discouragement is much less and hence the abridgment of freedom of expres sion is less when the college says ... you may exhibit your work on campus just not in the alcove off the mall") cert. denied 474 U.S. 1007 106 S.Ct. 528 88 L.Ed.2d 460 (1985).

. A very similar view has been expressed by our court in other constitutional contexts. For example, in Manzano v. South Dakota Dep't of Social Servs., 60 F.3d 505, 509-11 (8th Cir.1995), we observed that the constitutionally protected liberty interest which parents have in familial integrity is not absolute, and when a parent alleges that official conduct infringed upon that right, the merits of that constitutional challenge are determined by a balancing test. We then observed that "[t]he need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome.” Id. at 510. "Moreover, the requirement that the right be clearly established at the time of the alleged violation is particularly formidable.” Id. (citing cases). In Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987), also a case involving the constitutional right of familial integrity, we applied the doctrine of qualified immunity after noting our agreement with the Seventh Circuit's observation in Benson v. Allphin, 786 F.2d 268, 276 (7th Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), that, when a determination of constitutional protection turns on application of a balancing test, "the right can rarely be considered 'clearly established,’ at least in the absence of closely corresponding factual and legal precedent.”

. Having said this, we are quick to caution that today's holding by no means suggests that qualified immunity will protect public officials in every instance where the applicable constitutional standard involves a balancing test. As plaintiffs point out in their brief, this court has on at least two occasions denied qualified immunity to school officials who violated teachers’ First Amendment rights under Pickering. See South-side Public Schools v. Hill, 827 F.2d 270, 272-75 (8th Cir.1987) (denying qualified immunity to defendants, school officials, who had constructively terminated elementary school teachers in retaliation for having written a letter to the state department of education complaining about violations of the federal statutory requirement that handicapped children be provided a free appropriate public education); Lewis v. Harrison Sch. Dist. No. 1, 805 F.2d 310, 318 (8th Cir.1986) (qualified immunity denied to school superintendent and school board members who fired school principal for the stated reason, among others, that he had publicly criticized their decision to transfer his wife from the high school to the junior high school level).

. The Kohns have not alleged that their constitutional rights were violated because the photographs at issue represent a form of artistic expression, either standing alone or as an integral part of the overall exhibit.